**PORTLAND ADVENTIST MEDICAL CENTER, Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.***

Civ. A. No. 81–2956.

United States District Court, District of Columbia.

April 13, 1983.

---

* Though plaintiff named Carolyne K. Davis, Administrator of the Health Care Financing Administration, as defendant, the Court substitutes Margaret M. Heckler as the real party in interest. *See,* 42 C.F.R. § 405.1877.

Bruce R. Gilbert, Ronald N. Sutter, James C. Pyles, Washington, D.C., for plaintiff.

A. Patricia Frohman, Asst. U.S. Atty., Sarah Willis Wilcox, Dept. of Health and Human Services, Washington, D.C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge.

This is an action for judicial review of a final decision of the Secretary of Health and Human Services disallowing the claim of plaintiff, Portland Adventist Medical Center (PAMC), for certain interest costs for which PAMC sought Medicare reimbursement. Currently before the Court are cross-motions for summary judgment. Because there are only issues of law involved, this proceeding is before the court for a final determination on the merits. For the reasons stated below, the Court affirms the disallowance of plaintiff's claim and dismisses this proceeding.

Plaintiff, PAMC, a nonprofit corporation organized under Oregon law, is licensed by the Department of Human Resources of the State of Oregon to operate as a general acute care hospital. Plaintiff operates a hospital as defined under § 1861(e) of the Medicare Act, 42 U.S.C. § 1395x(e), and is a provider of services eligible for reimbursement under Part A of the Medicare Act. The defendant is Margaret M. Heckler, Secretary of Health and Human Services (Secretary). The Secretary has delegated broad responsibility to the Administrator of the Health Care Financing Administration, to administer Medicare. *See* 42 F.R. 57353 (November 2, 1977).

## BACKGROUND

### The Medicare Act

The Medicare program was established in 1965 to pay for specific types of medical care rendered to eligible aged and disabled Medicare beneficiaries. 42 U.S.C. §§ 1395, *et seq.* The program is divided into two main parts. Part A, entitled "Hospital Insurance Benefits," authorizes payment for Medicare patients receiving care from specified institutional providers—primarily hospitals, nursing homes, and home health care agencies. 42 U.S.C. §§ 1395c–1395i–2. Part B, entitled "Supplementary Insurance Benefits," authorizes the Government to pay for certain other types of medical care, including physicians' services and supplemental home health payments. 42 U.S.C. §§ 1395j–1395w. This case involves reimbursement for "hospital services" under Part A of Medicare.

A hospital may participate in the Medicare program as a provider of services under Part A of the program by entering into a "provider agreement" with the Secretary.

42 U.S.C. §§ 1395x(e), (u); 1395cc. The hospital then becomes entitled to payment of the lesser of the "reasonable cost" or the "customary charge" of "hospital services" it provides to Medicare beneficiaries. 42 U.S.C. §§ 1395f(b); 1395x(b), (e); 1395x(v)(1)(A). To oversee the payments made to providers, the Medicare statute permits the Secretary to enter into agreements with private entities, called "fiscal intermediaries" under Part A, to determine the amount of payment which is due to a hospital, and to make that payment to the hospital. 42 U.S.C. § 1395h. Usually those entities are insurance companies, such as Blue Cross Association—Blue Cross of Oregon in this case.

The Medicare statute and the Secretary's regulations set out a detailed payment process. *See* 42 U.S.C. §§ 1395f, 1395g; 42 C.F.R. 405.401–405.488. The hospital must file a cost report with its fiscal intermediary. 42 C.F.R. 405.406. Interim payments must be made to the hospital on a monthly basis and subsequent adjustments made for overpayments and underpayments. *See* 42 U.S.C. § 1395g; 42 C.F.R. 405.405. A final determination of the amount of the provider's reimbursable costs under Medicare is made after the close of the hospital's fiscal year, based upon its cost report. 42 C.F.R. 405.405. After the intermediary analyzes and, if necessary, audits the cost report, it issues the provider a "notice of program reimbursement," setting forth the final amount of reimbursement to which it is entitled in the fiscal year. 42 C.F.R. 405.-1803.

If the provider is dissatisfied with its intermediary's determination, and the amount in controversy is $10,000 or more, the provider may, within 180 days of its receipt of the final notice of reimbursement, request a hearing before the Secretary's Provider Reimbursement Review Board (the Board). 42 U.S.C. § 1395oo(a). Within 60 days after a final decision of the Board, the Secretary may, on his own motion, affirm, reverse, or modify the Board's decision (that is, exercise his "own motion review authority"). 42 U.S.C. § 1395oo(f); 42 C.F.R. 405.1875. If the provider is dis-

satisfied with the final decision of the Board or the affirmance, modification, or reversal of the Secretary, it may seek judicial review of that decision in the appropriate district court. 42 U.S.C. § 1395oo(f).

*The Facts*

The current dispute over reimbursement arises from two discrete projects upon which PAMC embarked in the 1970's. The first project was the establishment of a subsidiary corporation called "VertiCare." VertiCare was founded by PAMC on March 1, 1972, as a nonprofit corporation designed to establish a series of primary and ambulatory care centers in certain areas around Portland, Oregon, lacking adequate primary and ambulatory health services. Pursuant to a contract with PAMC, VertiCare was to operate group practice outpatient centers in and around the Portland area. In return, PAMC agreed to pay VertiCare certain costs relating to administrative overhead and capital expenses; to subsidize net income guarantees to the doctors working in those centers; and to provide subsidies to finance the facilities and land held by VertiCare for its future expansion.

Between 1973 and 1978, PAMC advanced approximately $800,000 to fund the start-up and operating costs of the VertiCare program. PAMC initially expected all of the funds advanced to VertiCare, with the exception of approximately $200,000 in start-up costs, to be repaid once the VertiCare program became self-sustaining. Of crucial importance to this case is the fact that PAMC did not charge interest or earn any income on the funds advanced to VertiCare. In 1979, when it appeared that VertiCare would not become self-sustaining without further monetary advances, PAMC terminated the VertiCare program.

The second project undertaken by PAMC was the construction of a new medical center. Built between 1974 and 1978 to replace PAMC's old facility, the center included a mechanical plant, a professional office building, and a 278 bed acute hospital. The $34.5 million project was funded, in part, by the issuance of $26 million in first mortgage

bonds issued in four denominations between August 1974 and February 1977. The $26 million in bond proceeds were kept in a separate account administered by a trustee, and, pursuant to terms of the bond indenture, were used exclusively to fund the cost of constructing the new medical center.

In its Medicare cost reports for 1976, 1977, and 1978, PAMC sought Medicare reimbursement for the "interest expense" on the full amount of mortgage bonds it had issued to finance construction of the new hospital facility. "Interest expense" is a cost element which the Secretary has prescribed to be reimbursable under Part A of Medicare. 42 C.F.R. 405.419. However, for interest expense to be reimbursable it must be "[n]ecessary and proper." 42 C.F.R. 405.419(a). When presented with PAMC's request for reimbursement, the intermediary allowed most of the interest cost claimed. But, the intermediary found that some of the interest on the mortgage bonds for the new hospital facility did not meet the Medicare regulatory requirement that interest incurred by the provider be "necessary." The intermediary based this determination on the fact that during the same period that PAMC was issuing mortgage bonds, it was also regularly lending substantial funds interest-free to its subsidiary, VertiCare. The intermediary therefore proceeded to reduce the amount of PAMC's interest claim by calculating a rate of 9% interest on the funds that PAMC had provided to VertiCare. It determined that amount by multiplying the average rate of interest on the mortgage bonds (9%) by the average balance of the accounts receivable from VertiCare for each year. In essence, the intermediary treated the interest-free loan to VertiCare as if the loan were earning interest income for PAMC, and then deducted that imputed interest income from the mortgage bond's reimbursable interest expense, thereby reducing PAMC's reimbursement. The intermediary's downward adjustment decreased PAMC's reimbursement by about $65,000 a year over the 40 year depreciable life of PAMC's new hospital.

PAMC appealed the partial disallowance decision to the Board, which affirmed the intermediary's decision. The Board held that some of the interest for which PAMC sought reimbursement was not "necessary" within the meaning of the Medicare interest rule. The Board found that PAMC had disbursed a substantial amount of funds from its working capital to VertiCare, which provided services unrelated to patient care at the hospital, and that because of this disbursement, the hospital had been required to borrow excess funds for its own construction program. The Board therefore found that the intermediary had properly reduced PAMC's interest claim.

The Secretary, through the Deputy Administrator of the Health Care Financing Administration, affirmed the Board's decision. In affirming the Board, the Deputy Administrator rejected all of PAMC's arguments in support of its claim, including the very arguments it now presses before this Court.

## ANALYSIS

This Court has jurisdiction by virtue of the Medicare Act, 42 U.S.C. § 1395oo(f).

PAMC concedes that the expenses of the VertiCare program are non-reimbursable under Part A of Medicare, but claims that here it is seeking reimbursement only for the interest expense of the bonds. The Secretary concedes that normally the interest expense on the mortgage bonds is reimbursable, but claims that the interest expense claimed by PAMC was inflated due to the interest-free loan advanced to VertiCare.

In support of its claim that the interest-free loan to VertiCare should not affect its reimbursement, PAMC presents four arguments: first, that the Medicare Act and its regulations mandate reimbursement; second, that the Secretary's decision is inconsistent with the Secretary's general policy of not penalizing providers by imputing interest; third, that in numerous statutes Congress has encouraged the establishment of outpatient clinics such as VertiCare and PAMC should therefore not be penalized

under the Medicare Act for conforming to Congress's expressed desires; fourth, that the imputation of interest by the Secretary violated the Medicare Act by interfering with PAMC's operation of its health care institution.

As a preliminary matter, the Court notes the narrow standard governing judicial review of the Secretary's determination. Under the Medicare Act, 42 U.S.C. § 1395oo (f)(1), the applicable standard of review is found in the Administrative Procedure Act, whereby the Secretary's determination may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). *Richey Manor, Inc. v. Schweiker,* 684 F.2d 130, 133–34 (D.C.Cir. 1982). Furthermore, because of the complexity of the Medicare Act, the Secretary's determination merits special deference.

> [W]here the decision under review involves an agency's interpretation of its own regulations, forming part of a complex statutory scheme which the agency is charged with administering, the arguments for deference to administrative expertise are at their strongest.... A reviewing court may not set aside the agency's interpretation merely because another interpretation was possible and seems better, so long as the agency's interpretation is within the range of reasonable meanings that the words of the regulation admit.

*Psychiatric Institute of Washington, D.C., Inc. v. Schweiker,* 669 F.2d 812, 813–14 (D.C.Cir.1981) (citation omitted). Given that deferential standard, the Court turns to plaintiff's individual claims.

██ PAMC'S first claim is that it is entitled to full reimbursement under the language of the Medicare Act and its regulations. The Medicare Act provides that a provider shall be reimbursed for "reasonable cost," defined as follows:

> The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost

found to be unnecessary in the efficient delivery of needed health services.

42 U.S.C. § 1395x(v)(1)(A).

Interest expense is reimbursable under this statute as a "reasonable cost." "Necessary and proper interest on both current and capital indebtedness is an allowable cost." 42 C.F.R. 405.419(a). The Secretary has defined "necessary" at section 405.-419(b)(2):

> Necessary requires that the interest:
>
> (i) Be incurred on a loan made to satisfy a financial need of the provider. Loans which result in excess funds or investments would not be considered necessary.
>
> (ii) Be incurred on a loan made for a purpose reasonably related to patient care.
>
> (iii) Be reduced by investment income except where such income is from gifts and grants, whether restricted or unrestricted, and which are held separate and not commingled with other funds. Income from funded depreciation or a provider's qualified pension fund is not used to reduce interest expense. Interest received as a result of judicial review by a Federal court (as described in § 405.-454(1)) is not used to reduce interest expense.

Plaintiff's interest claim did not meet the requirement that it be "necessary" under 42 C.F.R. 405.419(b). The Secretary properly found that not all the interest plaintiff claimed on the mortgage bonds for its replacement hospital facility was "incurred on a loan made to satisfy a financial need of the provider," 42 C.F.R. 405.419(b)(2)(i), and was therefore not "necessary." *See Abbot-Northwestern Hospital, Inc. v. Schweiker,* 698 F.2d 336, 340–42 (8th Cir.1983); *Gosman v. United States,* 573 F.2d 31, 41–42 (Ct.Cl.1976). Plaintiff's interest claim did not satisfy the financial need of the provider because the amount borrowed could have been lessened by the amount that the hospital took from its working capital to pay VertiCare. Otherwise, if this Court were to order full reimbursement for the bonds' interest expense, the result will be that

PAMC's non-reimbursable project, Verti-Care, would in actuality be reimbursed, via the reimbursement for the interest on the bond. That would encourage providers to borrow funds, rather than utilize existing working capital for building new facilities, because the rate on the borrowed funds would be subsidized by the Medicare reimbursement of the interest expense. *Cf. Illinois Central Community Hospital, Inc., Schweiker,* CCH Medicare and Medicaid Guide [1981 Transfer Binder] ¶ 31,421 (D.D.C. July 10, 1981) (no offset where the offset would not serve the purpose of discouraging the borrowing of unneeded funds).

For the same reason, plaintiff's interest claim also failed to meet the "necessary and proper" requisite of the more general regulation at 42 C.F.R. 405.451, defining "necessary and proper" costs as:

> costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs which are common and accepted occurrences in the field of the provider's activity.

42 C.F.R. 405.451(b)(2). Because PAMC could have used the funds that it loaned VertiCare to reduce the mortgage indebtedness, the resulting interest expense was not "necessary and proper" under 42 C.F.R. 405.451(b)(2).

In short, PAMC has not shown that the Secretary's interpretation of the Medicare Act and its regulations is "arbitrary and capricious."

▮ PAMC's second claim is that the Secretary's decision is inconsistent with the general practice of not imputing interest, and that the inconsistency reveals the "arbitrary and capricious" nature of the Secretary's decision.

PAMC, like virtually all Medicare providers, spends a significant portion of its working capital each year on activities which are not reimbursable under Medicare. Providers regularly spend their working capital on such activities as patient telephones, physician recruitment, outside laundry and linen, etc. For periods before, during, and after the construction loans, PAMC has used, is using and will use its working capital on such activities and other activities which are not reimbursable by Medicare. However, the Secretary has not imputed interest on working capital used for any of PAMC's nonreimbursable activities, with the exception of VertiCare. PAMC contends that this inconsistency renders the Secretary's decision arbitrary and capricious.

However, as the Secretary points out, this argument is faulty in two respects. These expenses are integral elements of operating a hospital. A hospital cannot be run without physicians, linen, or telephones. In contrast, VertiCare represents an expansion upon the hospital's activities that, however commendable, is not intrinsic to the hospital's operation. Furthermore, most of these other activities, such as phones and linens, actually earn money for most providers, and therefore, rather than burdening Medicare, actually add to a hospital's working capital, thereby decreasing the burden on Medicare.

The plaintiffs next argument is that the ambulatory and primary care services of VertiCare are precisely the sort of programs encouraged by Congress in numerous statutes. *See e.g.,* National Planning and Resources Development Act of 1974, 42 U.S.C. § 300k(a)(4), 300k–2(a)(1), (13); Act of November 10, 1978, 42 U.S.C. § 254a–1(b)(1) (establishing the Hospital Affiliated Primary Care Center Program). Even Medicare itself provides reimbursement—though under Part B, not Part A—for expenses a patient incurs in obtaining treatment in an ambulatory clinic. *See* 42 U.S.C. § 1395k(a)(2)(F).

The Court rejects this claim. Whatever policies other statutes may encourage, the simple fact is that PAMC is seeking reimbursement under Part A of the Medicare Act. Other statutes are not germane to the question of whether PAMC satisfies the requirements of Part A. Even Part B of Medicare, which *does* provide for reimbursement for expenses incurred in obtaining treatment from an ambulatory clinic, plays no role in deciding a reimbursement question under Part A. And, as shown,

PAMC is not entitled to reimbursement under the statute or regulations of Part A.

■ Lastly, the plaintiff claims that the Secretary's decision violates the Medicare Act, 42 U.S.C. § 1395, which provides that:

[n]othing in this subchapter shall be construed to authorize any Federal officer ... to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided ... or to exercise any supervision or control over the administration or operation of any ... institution, agency, or person [providing health services].

PAMC argues that the Secretary's decision represents the sort of interference barred by this section. *See Home Health Care, Inc. v. Schweiker,* 542 F.Supp. 1378 (D.D.C. 1982), *appeal docketed,* No. 82–2060 (D.C. Cir. September 14, 1982) and No. 82–2129 (D.C.Cir. September 17, 1982). In *Home Health,* the court ruled that the Secretary's decision to limit reimbursement for expenses incurred by a provider in leasing automobiles violated § 1395.

This Court does not agree with the holding in *Home Health,* and holds that limitations on reimbursement under Medicare to the "reasonable cost" incurred do not constitute prohibited interference under § 1395. *Accord, AMA v. Mathews,* 429 F.Supp. 1179 (N.D.Ill.1977). *See Szekely v. Florida Medical Association,* 517 F.2d 345, 350 (5th Cir.1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976); *Rasulis v. Weinberger,* 502 F.2d 1006, 1010 (7th Cir.1974). Congress did not by § 1395 intend to limit the broad grant of authority accorded the Secretary to determine the "reasonable cost" of Part A services. Section 1395 must be read together with § 1395x(v), which defines "reasonable cost" under Part A. *AMA v. Mathews,* 429 F.Supp. at 1202.

Congress made it clear ... that it did not view certain cost limitation mechanisms as within the ambit of § 1395. By enacting a strengthened cost limitation section (§ 1395x(v)(1)(A)) and authorizing the Secretary to exercise extensive cost control powers, Congress struck a balance between cost controls and professional independence.... The legislative history of § 1395x(v)(1)(A) demonstrates that Congress wanted the judgmental process in the health care delivery system to be influenced and animated by a consciousness of the costs of medical care .... In short, Congress did not intend to shield the medical decision-making process from financial consequences.

*Id.*

In sum, this Court holds that the Secretary's decision to award only partial reimbursement should be upheld.

An appropriate order accompanies this Memorandum Opinion.

### ORDER

Based on the accompanying Memorandum Opinion, it is, this 13th day of April, 1983,

ORDERED that defendant's motion for summary judgment is hereby granted, and it is further

ORDERED that plaintiff's motion for summary judgment is hereby denied, and the complaint is dismissed with prejudice.