### MONONGAHELA VALLEY HOSPITAL, INC.

v.

### Otis R. BOWEN, Secretary of the Department of Health and Human Services.

### Civ. A. No. 87–1697.

United States District Court, W.D. Pennsylvania.

Jan. 16, 1990.

Mary Drake Korsmeyer, Peacock, Keller, Yohe, Day & Ecker, Washington, Pa., for plaintiff.

U.S. Atty., Pittsburgh, Pa. and Javier A. Arrastia, Office of Gen. Counsel, Dept. of Health and Human Services, for defendant.

OPINION

COHILL, Chief Judge.

Plaintiff Hospital challenges the Secretary's decision concerning Medicare reimbursement for the fiscal year ending June 30, 1984. At issue is the Secretary's interpretation of regulations regarding interest offset when applied to a multi-corporation organizational structure.

## FACTS

Plaintiff Monongahela Valley Hospital, Inc. (Hospital) is a tax exempt non-profit corporation under the Internal Revenue Code, 26 U.S.C. § 501(c)(3), operating a hospital in Monongahela, Pennsylvania. Plaintiff was formed in 1976 as a result of the merger of two smaller hospitals.

In 1982 the Hospital underwent a corporate restructuring. The Hospital survived as a separate non-profit corporation, but it became a wholly owned subsidiary of a newly created parent corporation, Mon Vale Health Resources, Inc. (Mon Vale). This parent corporation also attained tax exempt status as a non-profit corporation. Plaintiff claims that this restructuring permitted greater flexibility in management, financing and regulatory concerns.

In June, 1982, the Hospital decided that a radiation therapy and oncology center was necessary to serve the people of the area, and so the Hospital applied to the Commonwealth's Department of Health for permission to build it. The projected cost of the center was $2.7 million. In July, 1983, the Hospital also applied to the Commonwealth for approval of the purchase of digital subtraction angiography equipment for $1.7 million. In March, 1984, the Hospital decided to replace its CAT scanner at a cost of $1.2 million.

These projects were approved by the Department of Health, but instead of being carried out by the original applicant (i.e., the Hospital) each project was carried out by Mon Vale with funds transferred to it by the Hospital. Upon completion of the projects, Mon Vale then transferred title to the Hospital. Simply put, the Hospital made the applications, obtained the necessary approvals, provided the funds, and ultimately received and operated the completed projects, but Mon Vale served as a middleman or conduit for each project.

In the Spring of 1984, Blue Cross, acting in its capacity as Medicare Intermediary, audited the Hospital for the fiscal year ending June 30, 1983. At that time the auditor raised questions about the details of the corporate restructuring and the transfer of $3.4 million from the Hospital to Mon Vale earmarked for the above-described projects.

At this point the reader is probably asking "So what?" If the projects were completed and ultimately titled in the entity that paid for them, where's the harm? The answer lies in the interstices of the Medicare regulatory scheme. The reader may follow at his peril as we step gingerly into the maze.

Medicare reimburses health care providers for certain types of medical care provided to aged and disabled patients eligible for Medicare. Reimbursement is made on the basis of certain computations which are horribly complicated. These computations are made by a middleman known as a "Fiscal Intermediary," which in this case was Blue Cross of Western Pennsylvania.

Apparently hospitals receive interim reimbursements during the course of the year and at the close of the fiscal year a final audit is performed by the Fiscal Intermediary to balance accounts.

These unfathomable reimbursement computations in some manner include consideration of interest. To grossly oversimplify, it appears that interest expense on borrowed money is somehow included in the computation of reimbursable costs, while interest income on invested funds is in some manner offset against such costs.

We trust that the patient reader will begin to see the focus. Beginning with the 1982–83 fiscal year, the Hospital claimed interest expense on money it had borrowed and sought to include such expense in the computation to determine reimbursable costs. But the Fiscal Intermediary noted that the Hospital had transferred $3.4 million to its parent, Mon Vale, and Mon Vale had earned a considerable amount of interest on these funds. The auditing intermediary thus sought to offset the interest earned by Mon Vale against the interest expense incurred by the Hospital, thereby reducing the Medicare reimbursement due the Hospital.

Fortunately for the Hospital, the auditing intermediary backed off from this position for the 1982–83 fiscal year. The final

audit report for that year, issued only four days before the close of the succeeding fiscal year, did *not* include the interest earned by Mon Vale as an offset against reimbursable costs.

The Hospital was not so fortunate in the audit for the fiscal year 1983–84. During that fiscal year, while the auditor was raising serious questions about the interest earned by Mon Vale on the $3.4 million transferred from the Hospital in 1982–83, the Hospital transferred an additional $2.1 million to Mon Vale. On January 29, 1985 the Health Care Financing Administration (HCFA), the federal agency which administers the Medicare program, issued an internal memo to Fiscal Intermediaries requiring the inclusion of interest earned by a parent or related corporation when computing a provider's reimbursement. On this basis the Fiscal Intermediary, conducting its audit for the 1983–84 fiscal year, offset Mon Vale's interest income of $386,998 against the Hospital's expenses for the year, resulting in a significantly reduced Medicare benefit.

The Hospital made timely appeals through the appropriate administrative channels. Although a minor adjustment was made ($9,700 interest earned on donations made directly to Mon Vale could not be offset against the Hospital), the auditor's position on the core of the dispute was affirmed.

The Hospital then filed this suit pursuant to 42 U.S.C. § 1395f seeking to overturn the Secretary's decision and obtain reimbursement of the higher sum due when the offset is not applied.

The parties have filed cross motions for summary judgment with briefs and the administrative record. A variety of issues are presented which we address seriatim.

## 1. *Equitable Estoppel*

■ Plaintiff seeks to apply equitable estoppel against the Secretary, arguing that the Fiscal Intermediary's decision *not* to offset Mon Vale's interest earnings in fiscal year 1982–83 lulled plaintiff into a

state of repose, and the Secretary's change in policy for fiscal year 1983–84 caught plaintiff by surprise. Assuming for the moment that equitable estoppel may be applied against the government, a premise that is not entirely clear, see, *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) (hereinafter *Heckler v. Crawford* ), we conclude that the Hospital's argument has several fatal flaws.

To invoke equitable estoppel a party must establish a material misrepresentation by the party to be estopped and reasonable detrimental reliance on that misrepresentation by the party asserting estoppel. E.g., *Heckler v. Crawford,* 467 U.S. at 59, 104 S.Ct. at 2223; Restatement 2d of Torts, § 894 (1979).

In the present case, the Hospital contends that the Fiscal Intermediary concluded the 1982–83 audit without applying the offset and assured the Hospital that the same result would obtain for 1983–84.[1] The Hospital claims that on the basis of this assurance, it did not alter its accounts for 1983–84, and thus was caught by surprise when the Secretary sought to offset Mon Vale's interest earnings. It is this alleged misrepresentation that plaintiff seeks to hold against the government to effect an estoppel.

The Hospital misapprehends the nature of the relationship between the Fiscal Intermediary and the Secretary. The Fiscal Intermediary is only a hired hand, an independent contractor selected by the government to conduct the audits. The Fiscal Intermediary cannot speak with finality for the Secretary on the interpretation of regulations and certainly cannot make policy pronouncements. *Heckler v. Crawford* 467 U.S. at 64, 65, 104 S.Ct. at 2225, 2226. Therefore the Secretary cannot be bound by the statements of the Fiscal Intermediary and, charged with this knowledge, the Hospital could not have reasonably relied on such statements.

---

1. We note that the Fiscal Intermediary flatly denies providing any such assurance, but to the contrary asked the Secretary for a ruling on the question.

The fallacy of plaintiff's position is further highlighted by the nature of the audits themselves. Medicare audits are subject to reopening and adjustment for a three year period. Thus the Hospital had to be aware that nothing was written in stone with the 1982–83 audit. Indeed plaintiff is fortunate that the Secretary applied the offset in the 1983–84 fiscal year and did not reopen the 1982–83 audit.

Finally, we fail to see how the 1982–83 audit and the alleged assurances from the Fiscal Intermediary caused plaintiff to suffer detriment in 1983–84. The 1982–83 audit was completed only *four days* before the end of the 1983–84 fiscal year. Mon Vale still held the $3.4 million transferred to it in 1982, and had received an additional $2.1 million from the Hospital in 1983–84. Mon Vale had already earned all but four days of interest for the 1983–84 fiscal year when the Fiscal Intermediary made its alleged misrepresentation. Furthermore, though the issue of offsetting Mon Vale's interest income had been raised as a serious matter by the Fiscal Intermediary months earlier, Mon Vale and the Hospital took no steps to avoid the effect of the offset rule in the event it was ultimately upheld. Having placed all its eggs in one basket, hoping to convince the Fiscal Intermediary that its interpretation was wrong, the Hospital cannot complain now that the basket was broken.

The Opinion in *Heckler v. Crawford* is most instructive. Like plaintiff here, the health care provider sought to estop the government from enforcing a new interpretation of the Medicare regulations. Like plaintiff here, it unreasonably relied on a verbal assurance from a Fiscal Intermediary on a matter of policy. Like plaintiff here, it knew or should have known that audits were subject to reopening for a three year period. Plaintiff seeks to distinguish this case by pointing out that here the Fiscal Intermediary conducted extensive investigation before choosing not to apply the offset in 1982–83. But the intensity of the Fiscal Intermediary's inquiry is of little relevance. The Fiscal Intermediary cannot set policy and the Hospital's

reliance on any such pronouncements is misplaced.

For the reasons stated, we conclude that equitable estoppel is not available in the circumstances presented.

### 2. *Secretary's Interpretation*

■ We now consider whether the Secretary's interpretation of its Regulations was reasonable. We recognize that the scope of our review is limited. If the interpretation is reasonable and supported by substantial evidence, we must affirm. *Monsour Medical Center v. Heckler,* 806 F.2d 1185, 1191 (3rd Cir.1986); *Butler County Memorial Hospital v. Heckler,* 780 F.2d 352, 355 (3rd Cir.1985).

■ Interest expense as a reimbursable cost is treated in detail at 42 C.F.R. § 405.419 (1984), which provides in pertinent part:

(a)(1) *Principle.* Necessary and proper interest on both current and capital indebtedness is an allowable cost ...

(b)(1) ...

(2) *Necessary.* Necessary requires that the interest:

(i) be incurred on a loan made to satisfy a financial need of the provider. Loans which result in excess funds or investments would not be considered necessary.

In the present case there is no question that if plaintiff had simply kept the $5.5 million it gave to its parent between 1982 and 1984, under § 405.419 any interest earned on that money would have been charged to plaintiff and offset any interest expense incurred. In short plaintiff could not charge Medicare for the expense of borrowing funds if it had sufficient funds already available to it.

But plaintiff did not keep that $5.5 million. Over two years it gave the money to its parent Mon Vale, a separate corporate entity. Plaintiff correctly points out that all interest on that money was earned by the parent, not the Hospital, and so plaintiff argues that interest earned by the parent cannot be offset against interest expense incurred by the Hospital.

The only regulation addressing the relationship of corporate parent and subsidiary in this context is § 405.427. Entitled "Cost to related organizations," it provides in pertinent part:

(a) Principle. Costs applicable to services, facilities, and supplier furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization ...

(b) Definitions—(1) Related to provider. Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

(2) Common ownership. Common ownership exists when an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.

(3) Control. Control exists where an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

Clearly these provisions only speak to the inclusion of *costs* of a parent or other related entity in computing Medicare reimbursement. Read literally, it has no direct application to the present case in which the Secretary seeks to *reduce* the provider's reimbursement by offsetting certain earnings of the parent.

Though it may not be strictly applicable here, § 405.427 does illustrate the Secretary's approach to the dilemma posed by multi-corporate organizational structures. In fairness to the health care provider that adopts or becomes part of a multi-corporate organizational structure for whatever benefits it brings, the Secretary will reimburse costs properly incurred by parent or sister corporations, even though they are separate corporate entities.

In fairness, the reverse should also be true. If a parent or sister corporation earns interest on invested funds which would otherwise be available to the provider, while the provider must borrow funds and incur interest expense, the Medicare program should not be charged for the expense without offsetting the earnings. To adopt the literal reading of the Regulations urged by plaintiff Hospital would allow providers to shelter investments while sapping the Medicare program for the cost of borrowing even more funds. On the other hand, reading the Regulations in concert with common sense and an understanding of Medicare's purpose of reimbursing "necessary" costs compels the conclusion reached by the Secretary. *Forsyth County Hospital Authority, Inc. v. Bowen,* 675 F.Supp. 1002 (M.D.N.C.1987), aff'd 856 F.2d 668 (4th Cir.1988). We conclude therefore that the Secretary's interpretation of its Regulations is reasonable and well supported by the record.

### 3. Related Organizations

■ Plaintiff challenges the Secretary's conclusion that the Hospital and Mon Vale are "related organizations" under § 405.427 for the purpose of imputing Mon Vale's interest earnings to plaintiff Hospital.

The core of plaintiff's argument is the factual assertion that plaintiff does *not* control Mon Vale. Plaintiff recites the organizational structure, the corporate formalities, the make-up of Mon Vale's Board of Directors and the nature of transactions between these two entities to establish that plaintiff does not control Mon Vale.

Plaintiff's facts are persuasive and unrebutted, and we agree that plaintiff does not control Mon Vale. But this is only half the equation.

Section 405.427 defines a related organization as one "in control of or *controlled by* " another entity. Thus, although plaintiff does not control Mon Vale, it is clear from the evidence that Mon Vale controls plaintiff. Indeed, it is not squarely denied. Plaintiff Hospital is a wholly owned subsidiary of Mon Vale. At Mon Vale's direction plaintiff transferred excess funds to Mon Vale and left to Mon Vale the ultimate use and disposition of those funds. Indeed Mon Vale used some portion of plaintiff's funds for Mon Vale's operating expenses.

Mon Vale is undoubtedly the controlling parent in this scenario and, with plaintiff Hospital, is a "related organization" within the meaning of § 405.427.

### 4. *Funded Depreciation Account*

■ Section 405.419 provides several exceptions to the offset rule, the most pertinent here being the exemption of interest income on monies invested in a funded depreciation account. In such an account, excess funds of the provider are set aside for future use for replacement of depreciable assets used in patient care. The Medicare program encourages providers to establish such accounts by sheltering the interest income on the account from the operation of the offset rule. The Medicare program benefits because the money in the fund reduces or eliminates the need to borrow funds when the depreciable asset needs to be replaced, and so reduces the amount of interest expense passed on to the Medicare program. See, *Phoenix Baptist Hospital & Medical Center, Inc. v. Heckler*, 767 F.2d 1304, 1307 (9th Cir.1985).

In the present case plaintiff admits that it did *not* place the funds at issue in a funded depreciation account in accord with the Secretary's regulations and manual. However, plaintiff contends that by transferring the funds to Mon Vale for the express purpose of acquiring or replacing certain capital assets, it created a de facto funded depreciation account and therefore income on such funds should be exempted from the offset rule.

A close examination of the facts supports plaintiff's argument. Although the funding and ultimate purchase of the depreciable assets did not comply with the regulatory requirements of the Secretary for funded depreciation accounts, these transactions were consistent with the spirit and purpose of such accounts. Funds were set aside, by transfer to Mon Vale, for three projects. Although the funds were not specifically earmarked for the projects, Mon Vale assumed contractual obligations for the purchase of equipment and construction of facilities, having only the funds transferred from plaintiff to pay its obligations. Although the funds were not segregated and designated for funded depreciation, Mon Vale was not a health care provider and did not own any depreciable assets, so it need not and could not establish a funded depreciation account in its own name. The projects were undoubtedly necessary for patient care, and indeed the Commonwealth approvals obtained by plaintiff included a determination that each project was necessary to serve the people of plaintiff's region.

Most importantly though, the use of Mon Vale as plaintiff's conduit for these projects satisfied the principle purpose of a funded depreciation account. Excess funds were set aside for appropriate projects necessary for patient care. These projects were completed *without* borrowing funds, and thus without passing on interest expense from such projects to the Medicare program.

It is also important to note that there is no evidence of self-dealing between plaintiff and Mon Vale to the detriment of the Medicare program. The prevention of such self-dealing is perhaps the primary reason for the Secretary's approach to a multi-corporate organizational structure as set forth in § 405.427. See, *Monsour Medical Center v. Heckler*, 806 F.2d 1185 (3rd Cir.1986); *Forsyth County Hospital Authority, Inc. v. Bowen*, 675 F.Supp. 1002 (M.D.N.C. 1987). In this case plaintiff Hospital got exactly what it paid for and exactly what the Medicare program encouraged—necessary medical facilities and equipment paid for with excess funds and without incurring interest expense. There is no contention that the price of these projects was improper or inflated. There is no evidence that Mon Vale obtained any gain or that plaintiff Hospital incurred any loss from these transactions. There are no hidden windfalls or incestual profits between parent and subsidiary.

The Secretary's findings on this issue were limited to a recitation of the ways in which these transactions failed to comply with the Secretary's regulations and rules for funded depreciation accounts. The Secretary failed to examine the matter in terms of policy, to decide if these transac-

tions accomplished the same purpose as a funded depreciation account though not satisfying the technical requirements. In light of our discussion of the facts above, the Secretary's decision was not based on substantial evidence, but to the contrary the facts clearly support plaintiff's contention.

We hasten to add that our holding is strictly limited to the facts of this case, facts which indicate an extraordinary set of circumstances in which the government is not entirely blameless and which provide considerable justification for plaintiff's failure to properly establish a funded depreciation account. As discussed above, § 405.419 and § 405.427 read literally did not apply to plaintiff's circumstances, and plaintiff was so advised by its accounting firm. At the time of the initial transfer of funds to Mon Vale, the Secretary had not yet interpreted these regulations in light of plaintiff's circumstances. Although the issue arose in the 1982–83 audit, the Secretary's interpretation was delayed until the following year. When the interpretation was issued, it was not immediately communicated to the plaintiff.

As discussed above, these facts do not give rise to estoppel, but they do provide justification for plaintiff's failure to comply with the regulatory requirements for a funded depreciation account. Confronted in 1982 with imprecise regulatory language in § 405.419 and § 405.427 and the lack of any clarifying interpretation, plaintiff cannot be entirely faulted for selecting the Mon Vale conduit as an alternative to a funded depreciation account.

Unfortunately though, the present record leaves many unanswered questions. Did plaintiff exceed the limit on amounts that can be sheltered in a funded depreciation account? Because the project funds were commingled with Mon Vale's operating funds, how much is properly treated as funded depreciation? What has happened to the interest earned on these funds? If the interest was not spent on the projects, does the Medicare program require that it be retained in a funded depreciation account for future projects?

These questions are beyond our scope and expertise. Indeed we lack the expertise to identify all the possible issues created by a de facto funded depreciation account. Therefore this matter must be remanded to the Secretary for further proceedings. Essentially the Secretary must attempt to place plaintiff in the position it would have been in if it had created a funded depreciation account to accomplish the projects at issue instead of using Mon Vale as a conduit.

## CONCLUSION

For the reasons stated, we conclude that the Secretary's interpretation of its regulations is reasonable, that the Secretary is not estopped in these circumstances, but plaintiff created a de facto funded depreciation account by its transfers to Mon Vale to the extent those funds were used to complete the subject projects. This matter is remanded to the Secretary for further proceedings consistent with this Opinion.

## ORDER

AND NOW, this 16th day of January, 1990, in accord with the accompanying Opinion, it is hereby ORDERED that the decision of the Secretary is AFFIRMED in part and VACATED in part, and this matter is REMANDED to the Secretary for further proceedings consistent with this Opinion, forthwith.