HINSDALE HOSPITAL CORPORATION,
Plaintiff,

v.

Donna E. SHALALA, Secretary, Department of Health and Human Services, Defendant.

No. 93 C 1201.

United States District Court,
N.D. Illinois,
Eastern Division.

June 22, 1994.

Lawrence A. Manson, Dorthy J. Voss, Keck, Mahin & Cate, Chicago, IL, for plaintiff.

Deborah A. Hill, U.S. Attys. Office, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Plaintiff Hinsdale Hospital Corporation ("HHC") brought this action pursuant to 42 U.S.C. § 1395oo(f) providing for judicial review of final determinations by the defendant, the Secretary of the Department of Health and Human Services ("the Secretary"), concerning disputed claims for Medicare reimbursement. Plaintiff challenges the amount of reimbursement to which it is entitled under the Medicare Act, 42 U.S.C. § 1395 *et seq.* Plaintiff and defendant have filed cross-motions for summary judgment. For the reasons set forth below, plaintiff's motion is denied and defendant's motion is granted.

## I. PROCEDURAL BACKGROUND

This case arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.,* commonly referred to as the Medicare Act. Under Part A of the Medicare program, the federal government reimburses eligible hospitals and other facilities for the reasonable costs of certain services they provide to Medicare beneficiaries. 42 U.S.C. § 1395d. Reasonable costs are those "actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations" established by the Secretary. 42 U.S.C. § 1395x(v)(1)(A). In order to be eligible for reimbursement, a hospital must first become a Medicare "provider" by filing an agreement with the Secretary. 42 U.S.C. § 1395cc. Reimbursements are usually arranged through a fiscal intermediary who serves as the Secretary's agent for reviewing claims and making payments equal to the provider's reasonable costs. 42 U.S.C. § 1395h. Each provider files an annual cost report with the intermediary, who audits the report and informs the Provider of the amount of reimbursement to which the provider is entitled.

A provider who is dissatisfied with the intermediary's disposition may request a hearing before the Provider Reimbursement Review Board ("Review Board") of Health and Human Services. 42 U.S.C. § 1395oo(a). The Review Board's decision becomes the final decision of the agency, unless the Secretary, on her own motion, decides to reverse, affirm or modify the Review Board's decision within sixty days. 42 U.S.C. § 1395oo(f)(1). After the final opinion of the Secretary is determined, a Provider may seek judicial review in federal district court. 42 U.S.C. § 1395oo(f)(1).

The intermediary in this case denied certain Medicare reimbursements sought by plaintiff Hinsdale Hospital. Plaintiff sought review of the denial before the Review Board. The Review Board affirmed the denial. The Secretary allowed the Review Board's decision to become final by not acting on it within sixty days. Plaintiff now appeals to this court.

## II. *FACTUAL BACKGROUND*

The facts of this case are complicated but basically undisputed. The Provider, Hinsdale Hospital (HH), is a 456–bed acute tertiary care, non-profit hospital located in Hinsdale, Illinois. It is part of the nationwide Adventist Health Care System (AHS), which is sponsored by the Seventh–Day Adventist Church and controlled through a corporate parent and four regional corporations. In November 1982, AHS decided to acquire a financially distressed, 149–bed acute care hospital located in Glendale Heights, Illinois. This hospital, previously named Midwest Community Hospital, was renamed Glendale Hospital (GH).

On November 18, 1982, AHS created a new Illinois non-profit corporation, Glendale Heights Community Hospital, Inc. (GHCH), to purchase and operate GH. However, GHCH could not independently secure financing for the purchase price of approximately $33.8 million because of restrictive covenants in outstanding bonds issued by the Provider in 1978 and 1981. Consequently, AHS directed the Provider to enter into an agreement to purchase GH. In order to obtain the necessary interim financing of the purchase price, the lenders required GH to be placed in the Provider's corporation, plaintiff Hinsdale Hospital Corporation (HHC), where it remained for about 7–9 months until permanent financing could be arranged.

The acquisition was completed on November 24, 1982. During the period from November 1982 until July 1983, the Provider transferred $5.9 million to GH in the form of interest-bearing promissory notes. When permanent financing was arranged on July 12, 1983, GH was transferred to GHCH.

The permanent financing consisted of two separate tax-exempt municipal bond issues. First, on May 20, 1983, the Village of Glendale Heights issued $35 million in 5–year bonds (GH bonds) which were used to replace the interim financing with permanent financing and as reimbursement for other acquisition costs. Second, on July 12, 1983, the Village of Bolingbrook issued $44.8 million in refunding and improvement bonds (BLB bonds). Of that $44.8 million, approximately $38.9 million was used to refinance the Provider's outstanding 1978 and 1981 bonds and the remaining $5.9 million was used by the Provider to purchase equipment. The restrictive covenants in the Provider's 1978 and 1981 bonds that had precluded the transfer of GH to GHCH were then removed, and GH was transferred to GHCH on July 12, 1983. On December 31, 1984, the Provider asked for and received confirmation from GHCH that GHCH owed the Provider $7.5 million, which included the $5.9 million initial transfer, interest and other related amounts.

The fiscal intermediary, Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Illinois ("the intermediary"), initially did not question the two borrowings and offset the interest income accrued on the $5.9 million loaned to GH against the Provider's interest expense for the fiscal years 1983 and 1984. In 1986, the Provider determined the $5.9 million loan was uncollectible and wrote it off, which caused the intermediary to review the entire matter. The intermediary then determined that the additional $5.9 million borrowed in BLB bonds in July 1983 was unnecessary and disallowed the interest expense for that amount on the Provider's cost reports for the fiscal years in dispute, FYE 1985 ($297,000), 1986 ($365,000), 1987 ($206,000) and 1988 ($202,000). The estimated aggregate amount of Medicare reimbursement in controversy during those years is $1,070,000.

The Review Board affirmed the intermediary's decision. The Secretary, through the Administrator of the Health Care Financing Administration, declined to review that decision, so the Review Board's decision became the final decision of the Secretary. The Provider then filed suit in federal court. On March 21, 1994, the Magistrate Judge issued a Report and Recommendation ("Report") recommending that the Review Board's decision be reversed in favor of the plaintiff. *Hinsdale Hosp. Corp. v. Shalala,* 1994 WL 465832, 1994 U.S.Dist. LEXIS 3336 (N.D.Ill. March 21, 1994) (Mag. J. Guzman).

## III. *STANDARD OF REVIEW*

■ Pursuant to 28 U.S.C. § 636(b)(1), this court must review the Magistrate

Judge's Report *de novo.* At the same time, the standard of review to be applied to the Review Board's decision is much narrower and is governed by the Administrative Procedure Act ("the APA"). 5 U.S.C. §§ 701–06. Under the APA, a reviewing court should reverse an agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if the decision is unsupported by substantial evidence in the administrative record. 5 U.S.C. § 706(2)(A), (E); *see also Batterton v. Francis,* 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977).

■■■ Substantial evidence "may be less than a preponderance of the evidence." *Freeman United Coal Mining Co. v. Stone,* 957 F.2d 360, 362 (7th Cir.1992). It need only be enough relevant evidence that a reasonable mind might find sufficient to support a conclusion. *See, e.g., Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Loyola Univ. of Chicago v. Bowen,* 905 F.2d 1061, 1067 (7th Cir.1990). The standard of review set forth by the APA "is highly deferential"—a court presumes that the agency action is valid and will affirm the agency decision if it has any rational basis, thereby refusing to substitute its own judgment for that of the agency. *American Hosp. Ass'n v. Schweiker,* 721 F.2d 170, 175–76 (7th Cir.1983).

■■■ The presumption in favor of the agency's decision is based on the policy that "considerable deference" should be given to the agency's expertise in administering its own programs. *See, e.g., Loyola Univ.,* 905 F.2d at 1067; *Adventist Living Ctrs., Inc. v. Bowen,* 881 F.2d 1417, 1420–21 (7th Cir.1989); *St. Vincent Memorial Hosp. Corp. v. Shalala,* 827 F.Supp. 517, 521 (C.D.Ill.1993). Such deference is especially appropriate in Medicare reimbursement cases, where judgments about appropriate cost-accounting practices are required. *Abbott–Northwestern Hosp., Inc. v. Schweiker,* 698 F.2d 336, 340 (8th Cir.1983). Thus, where the decision at issue "involves an agency's interpretation of its own regulations, forming part of a complex statutory scheme which the agency is charged with administering, the arguments for deference to administrative expertise are

at their strongest." *Psychiatric Inst. of Washington, D.C., Inc. v. Schweiker,* 669 F.2d 812, 813–14 (D.C.Cir.1981).

Furthermore, while a reviewing court cannot entirely ignore the Secretary's decision, the court is "not empowered to overrule the Secretary's interpretation merely because it does not coincide with [the court's] notion of 'reasonable cost,' or because [the court] might have interpreted the statute in a different manner." *Northwest Hosp., Inc. v. Hospital Serv. Corp.,* 687 F.2d 985, 990 (7th Cir.1982). A reviewing court must therefore accept the Secretary's interpretation, even if another interpretation is possible and seems better, so long as the Secretary's interpretation "is within the range of reasonable meanings that the words of the regulation admit." *Marymount Hospital, Inc. v. Shalala,* 19 F.3d 658, 661 (D.C.Cir.1994) (*quoting Psychiatric Inst.,* 669 F.2d at 814). Thus, when the statute does not specifically address the issue at hand, the question is "whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

## IV. *DISCUSSION*

■■■ The primary issue in this case is whether the intermediary's adjustment disallowing a portion of the Provider's interest expense related to the $5.9 million in BLB bonds was proper. Because the Review Board's decision is a permissible construction of the statute and is supported by substantial evidence in the administrative record, the Review Board's decision is affirmed.

■■■ Under the Medicare Act, a health care provider may be reimbursed for interest expense on "both current and capital indebtedness" if such expense is "necessary and proper." 42 C.F.R. § 413.153(a)(1). "Necessary" interest must be "incurred on a loan made to satisfy a financial need of the provider" and "incurred on a loan made for a purpose reasonably related to patient care." 42 C.F.R. § 413.153(b)(2)(i)-(ii). In addition, since "[l]oans that result in excess funds or investments would not be considered neces-

sary," 42 C.F.R. § 413.153(b)(2)(i), interest expense must be "offset," or reduced, by investment income. 42 C.F.R. § 413.-153(b)(2)(iii). Thus, a provider's reimbursement for interest expense is limited to the net cost of borrowing. *Monongahela Valley Hosp., Inc. v. Sullivan,* 945 F.2d 576, 591 (3d Cir.1991).

One of the purposes of the interest offset rule is to discourage a provider from borrowing money at the expense of Medicare and taxpayers when the provider has investment funds available. *See, e.g., Marymount Hosp.,* 19 F.3d at 663; *Forsyth County Hosp. Auth., Inc., v. Bowen,* 675 F.Supp. 1002, 1006 (M.D.N.C.1987), *aff'd,* 856 F.2d 668 (4th Cir. 1988). In *Marymount Hospital,* the Circuit Court affirmed the Secretary's decision to offset interest expense incurred by Marymount Hospital after it contributed start-up money to its parent corporation, MHCS. *Marymount Hosp.,* 19 F.3d at 663. The Court of Appeals refused to overturn the Secretary's argument

> that Marymount's voluntary decision to give to MHCS funds that Marymount might have retained clearly makes some of the interest expense for its own borrowing 'unnecessary' under the statute. As the district court noted, had Marymount not contributed the funds to MHCS, it would have continued to have the funds to invest.

*Id.* at 662.

In *Portland Adventist,* the hospital (PAMC) began construction of a new medical center in 1974 after previously loaning money to a subsidiary corporation (VertiCare) for its start-up and operating costs. VertiCare, which received approximately $800,000 from PAMC between 1973 and 1978, was a nonprofit corporation designed to establish a series of primary and ambulatory care centers in certain geographical areas. PAMC's construction project was financed primarily through the issuance of mortgage bonds between 1974 and 1977. PAMC sought Medicare reimbursement for the interest expense on the full amount of those bonds, but the intermediary disallowed some of the interest expense because it was unnecessary. "The intermediary based this determination on the fact that during the same period that PAMC was issuing mortgage bonds, it was also regularly lending substantial funds interest-free to its subsidiary, VertiCare." *Portland Adventist Medical Ctr. v. Heckler,* 561 F.Supp. 1092, 1095 (D.D.C.1983). The Review Board affirmed the intermediary's decision. The district court affirmed the Review Board's decision, emphasizing that "[PAMC]'s interest claim did not satisfy the financial need of the provider because the amount borrowed could have been lessened by the amount that the hospital took from its working capital to pay VertiCare." *Id.* at 1096.

Similarly, the $5.9 million borrowing in the present case did not satisfy a financial need of the Provider. Had the Provider not loaned $5.9 million to GH, the plaintiff would not have had to borrow an additional $5.9 million in July 1983, in order to purchase equipment. Thus, the interest expense incurred on the July 1983 borrowing was properly disallowed by the intermediary and the Review Board. Plaintiff attempts to distinguish *Portland Adventist* by claiming PAMC and VertiCare were separate legal entities, whereas HH and GH were part of the same corporation. The plaintiff maintains that it therefore had a fiduciary duty to act in the best interests of both hospitals after the acquisition of GH was completed. However, the interest expense incurred by the provider in *Marymount* was offset even though the money transferred came from two related entities within the same corporate structure. Likewise, although the Provider and GH were separately incorporated, they are both part of the same corporate structure under the control of AHS.

Furthermore, corporate law principles are not dispositive in determining whether the Review Board's decision was proper. "Under the Medicare statutory scheme, Medicare principles, and not those drawn from other areas of the law, govern." *Marymount Hosp., Inc. v. Sullivan,* 791 F.Supp. 878, 884 (D.D.C.1992), *aff'd,* 19 F.3d 658 (D.C.Cir. 1994). "Accounting and legal principles appropriate in other contexts for other purposes have little persuasive force here because the question before us must be decided according to the Medicare regulations and the policies those regulations were designed

to implement." *Richey Manor, Inc. v. Schweiker,* 684 F.2d 130, 135 (D.C.Cir.1982). If this court ordered reimbursement for the Provider's interest expense on the $5.9 million in BLB bonds, that result would not accord with Medicare policies because it would "encourage providers to borrow funds, rather than utilize existing working capital for building new facilities, because the rate on the borrowed funds would be subsidized by the Medicare reimbursement of the interest expense." *Portland Adventist,* 561 F.Supp. at 1097.

The court in *Portland Adventist* noted that PAMC's loaning of money to VertiCare "represents an expansion upon the hospital's activities that, however commendable, is not intrinsic to the hospital's operation." *Id.* Similarly, HH's transfer of funds to GH was not intrinsic to HH's operation. The Magistrate Judge noted that GH was "set up to serve as a satellite facility for the Provider, offering basic services to the community." (Report, p. 18). At no time, however, was GH held out as a branch or subsidiary of HH. Each hospital was separately certified and licensed, and had separate medical staffs and Board structures as well. Even during the period from November 1982 until July 1983, when GH was part of the Provider's corporation, GH had its own separate staff and governing body. Moreover, the Provider acquired GH at the direction of the Provider's corporate parent, AHS. Thus, the acquisition was not intrinsic to the *Provider's* operations; rather, it was an acquisition that was desired by AHS which ultimately created an artificial need to borrow. In light of these facts and policy considerations, there is substantial evidence in the administrative record to support the Review Board's finding that the borrowing was unnecessary.

■ Plaintiff also argues that the interest expense it incurred was not on a loan but rather was the result of an intracorporate transfer from one department of the corporation to another. The fact that the transfer was accomplished through interest-bearing promissory notes, however, is substantial evidence that the $5.9 million was intended by both hospitals to be a loan. In addition, the Provider asked for and received confirmation

from GH that $5.9 million plus interest was owed to the Provider. Further, GH was released from its obligation to pay the $7.5 million only after HHC's Board adopted a resolution authorizing such a release. The $5.9 million in advances were carried as loans on HHC's books, and the Provider even referred to the advances as loans in its position paper to the Review Board. These facts adequately support the Review Board's finding that the $5.9 million was a loan rather than an intracorporate transfer.

■ The Review Board also applied the "related organizations rule" as support for the intermediary's decision disallowing reimbursement for the Provider's interest expense. The related organizations rule states that

> costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities or supplies that could be purchased elsewhere.

42 C.F.R. § 413.17(a). An organization is "related to the provider" if, *inter alia,* it "to a significant extent is associated or affiliated with" the provider, 42 C.F.R. § 413.17(b)(1), or if "an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of ... an institution." 42 C.F.R. § 413.17(b)(3). The purpose of the related organizations rule is "to prevent providers from inflating their reimbursable costs by engaging in self-dealing with their affiliates." *Marymount Hosp.,* 19 F.3d at 662.

GH is a related organization of the Provider. GH was owned by the Provider's corporation, HHC, from November 1982 until July 1983. In addition, both hospitals are associated with and affiliates of AHS. Finally, AHS, by directing the Provider to enter into an agreement to purchase GH, had the direct power to control and influence the actions of the Provider and GH, which was established as a peer hospital within AHS. Since the expenses incurred by the Provider to purchase equipment could have been avoided if the $5.9 million loan were not made, the Review Board's decision was not unreasonable. The Review Board's reliance on the

related organizations rule as a principle to help determine whether the Provider's borrowing was necessary was not unreasonable. *See Id.* at 662–63.

The Provider's claim that *Northwest Hospital* and *Trustees of Indiana Univ. v. United States,* 223 Ct.Cl. 88, 618 F.2d 736 (1980), support the argument that the related organizations rule should not be applied is unpersuasive. The reasoning of those cases would apply only if GH were denied reimbursement for interest expense solely as a related entity, which is not the issue in this case. Additionally, the *Trustees* court emphasized that its decision was limited to "the particular and unusual circumstances of this case." 618 F.2d at 740. The court allowed reimbursement in that case because a state law prohibited the hospital from borrowing from outside sources. In the present case, no such law existed. Rather, the Provider was not able to find a lender who would allow GHCH to secure financing on its own. But a *de facto* barrier to borrowing is not equivalent to a *de jure* restriction.

Citing the Review Board's dissent, the Provider argues that the status of GH before and after the transaction is irrelevant. The Provider maintains that since GH was under the Provider's corporate structure when the $5.9 million was transferred, GH should be treated as a hospital department. However, looking merely at the relationship at the time the transaction took place could provide an incentive for providers to abuse the Medicare Act. A provider could place a financially distressed hospital or facility into the provider's corporation and then rely on fiduciary duties to justify their borrowing as "necessary." Such an interpretation of the statute would circumvent the "necessary" requirement of the statute and render it meaningless. It would give providers free reign to expand into areas that are not intrinsic to the provider's operations. Such actions would also give corporate law principles precedence over Medicare principles, which is contrary to case law in this area. *See, e.g., Marymount Hosp.,* 791 F.Supp. at 884; *Richey Manor,* 684 F.2d at 135.

■ Finally, the Provider argues that necessity must be determined at the time of borrowing and the intermediary should not be allowed to change its decision about the necessity of the 1983 borrowing nearly three years later. The intermediary was justified, however, in changing its decision and is not equitably estopped from doing so in this case. "Medicare audits are subject to reopening and adjustment for a three year period. Thus the Hospital had to be aware that nothing was written in stone with the [earlier] audit." *Monongahela Valley Hosp., Inc. v. Bowen,* 728 F.Supp. 1172, 1176 (W.D.Pa. 1990), *aff'd in relevant part, rev'd in part,* 945 F.2d 576 (3d Cir.1991).

## V.  *CONCLUSION*

For the foregoing reasons, defendant's Motion for Summary Judgment is granted and plaintiff's Motion for Summary Judgment is denied. The decision of the Secretary is affirmed.