945 F.2d 576
 60 USLW 2214, 35 Soc.Sec.Rep.Ser. 154,
Medicare & Medicaid Guide P 39,595
 MONONGAHELA VALLEY HOSPITAL, INC.
v.
Louis W. SULLIVAN, M.D., Secretary of Health and Human Services,
Monongahela Valley Hospital, Inc., Appellant in 90-3247,
Louis W. Sullivan, M.D., Secretary, Appellant in 90-3207.
 Nos. 90-3207, 90-3247.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 30, 1990.
Decided Sept. 20, 1991.
 
 Mary Drake Korsmeyer (argued), Peacock, Keller, Yohe, Day & Ecker, Washington, Pa., for Monongahela Valley Hospital, Appellant in 90-3247.
 Stuart M. Gerson, Asst. Atty. Gen., Thomas W. Corbett, Jr., U.S. Atty., Anthony J. Steinmeyer, John C. Hoyle (argued), Appellate Staff Civil Div., Dept. of Justice, Washington, D.C., for Louis W. Sullivan, M.D., Secretary, Appellant in 90-3207.
 Before BECKER, NYGAARD and ALITO, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 These consolidated cross-appeals by plaintiff Monongahela Valley Hospital ("Monongahela") and defendant Louis W. Sullivan, Secretary of Health and Human Services ("HHS"), concern the Secretary's interpretation of the former HHS regulations under which hospitals were reimbursed for services provided to Medicare beneficiaries on the basis of actual, reasonable costs incurred.[1] See 42 C.F.R. § 405.451, recodified at 42 C.F.R. § 413.9 (1990).[2] Primarily at issue are the regulations requiring health care providers that claim interest expense as a reimbursable cost of rendering health care services to Medicare beneficiaries to offset any investment income against that interest expense, unless the provider complies with the rigorous requirements for demonstrating that such investment income is to be used to fund the depreciation of assets. See 42 C.F.R. § 405.419, recodified at 42 C.F.R. § 413.153 (1990). Also at issue is a regulation that, for the purpose of determining whether investment income is to be offset against interest expense, treats health care providers under common ownership or control as a single entity. See 42 C.F.R. § 405.427, recodified at 42 C.F.R. § 413.17(a) (1990).
 
 
 2
 Monongahela brought this action in the district court for the Western District of Pennsylvania pursuant to 42 U.S.C. § 1395oo (f)(1), which provides for judicial review of final administrative decisions concerning disputed claims for Medicare reimbursement. The action followed administrative determinations requiring the offset of Monongahela's investment income against its interest expense--thereby reducing by approximately $213,000 Monongahela's Medicare reimbursement for the fiscal year ("FY") ending June 30, 1984. These determinations were made by: (1) Blue Cross-Blue Shield of Western Pennsylvania ("Blue Cross"), Monongahela's fiscal intermediary; (2) the Provider Reimbursement Review Board (the "Board"); and (3) the Administrator of the Health Care Financing Administration (the "HCFA").
 
 
 3
 The district court held that the Secretary did not act arbitrarily and capriciously in determining that the interest earned on funds transferred from Monongahela to its parent corporation, Mon Vale Health Resources, Inc. ("Mon Vale"), must be imputed to Monongahela to be offset against interest expense. The court also determined that, even though the fiscal intermediary had failed to require such a reduction when Monongahela applied for its Medicare reimbursement in the previous year, the Secretary was not equitably estopped from requiring that Monongahela subsequently offset the interest. On Monongahela's appeal from these adverse decisions, we affirm.
 
 
 4
 The district court further held, however, that the Secretary had acted arbitrarily and capriciously in determining that the interest earned on funds that Monongahela had transferred to Mon Vale did not fall within the exception to the interest offset rule concerning investment income used to fund the depreciation of assets. Although Mon Vale failed to place the transferred funds in a separate "funded depreciation account," as required by the Secretary's Provider Reimbursement Manual, the district court concluded that Monongahela did not have to offset against its interest expense the income from the funds that Mon Vale had used to acquire and to replace depreciable assets. On the government's appeal from this decision, we reverse.
 
 
 5
 In light of its conclusion that Monongahela need not offset the interest income that its parent corporation expended on capital assets, the district court remanded the case for the Secretary to determine the amount of interest that should be exempt from the interest offset rule and for other proceedings consistent with its opinion. As a result of this remand, Monongahela, in the form of a motion to dismiss this appeal for lack of a final order, raises questions concerning our appellate jurisdiction. Monongahela's jurisdictional challenge presents an important question of interpretation of the Supreme Court's recent decision in Sullivan v. Finkelstein, --- U.S. ----, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990). Finkelstein held that a district court's order remanding a spouse's claim for disability insurance benefits to the Secretary of HHS for reconsideration without regard to the applicable regulations, which the order essentially invalidated, was immediately appealable as a final decision under 28 U.S.C. § 1291 (1988). Application of the criteria announced in Finkelstein leads to the conclusion that we have appellate jurisdiction. Before addressing either jurisdiction or the merits, however, we must, in order to make that discussion intelligible, describe the factual background, statutory scheme, and procedural history giving rise to this case.
 
 I. THE FACTUAL BACKGROUND[3]
 
 6
 Monongahela is a non-profit, tax exempt corporation that was formed in 1976 as a result of the merger of two smaller hospitals. See Monongahela Valley Hospital v. Bowen, 728 F.Supp. 1172, 1174 (W.D.Pa.1990). In order to construct the present hospital facility, the hospital authority in the county in which Monongahela is located issued $24,200,000 in gross revenue bonds, giving rise to the hospital's interest expense. In 1982, Monongahela underwent a corporate reorganization, in which a new corporate entity, Mon Vale, was created to function as the parent corporation for the hospital and other health service entities.[4] See id. Like Monongahela, Mon Vale is a tax exempt, non-profit corporation. Monongahela, now a wholly-owned subsidiary of Mon Vale, has retained its own non-profit corporate identity and tax exempt status under the Internal Revenue Code, 26 U.S.C. § 501(c)(3) (1988). See id.
 
 
 7
 After assessing community health care needs, Monongahela, between 1982 and 1984, applied to the Commonwealth of Pennsylvania's Department of Health for authorization to embark on several capital projects, including the construction of a radiation therapy and oncology center, the acquisition of digital subtraction angiography equipment, and the replacement of its CAT scanner. See id. Following the Department of Health's approval of these projects, at a projected cost of approximately $5.6 million, Monongahela transferred the necessary funds to Mon Vale, which carried the projects out. Id. At the time that Mon Vale undertook construction of the radiation therapy and oncology center, the officers of the two corporations had not yet decided whether the new facility would be owned and operated by Monongahela or by its parent.[5] Mon Vale, however, subsequently transferred the completed radiation therapy and oncology center, as well as the acquired equipment, back to Monongahela. The district court determined that "[s]imply put, the [h]ospital made the applications, obtained the necessary approvals, provided the funds, and ultimately received and operated the completed projects, but Mon Vale served as a middleman or conduit for each project." Id.
 
 
 8
 The manner in which Monongahela transferred to Mon Vale the funds necessary for its capital construction and asset acquisition projects is at the heart of this case. What happened is that Monongahela simply transferred the funds to its parent, without designating that they were to be used for the construction and acquisition of depreciable assets. Most pertinently, Monongahela failed to place the amounts that it transferred to Mon Vale in a "funded depreciation" account of the type that the HCFA had instructed Medicare providers to use to ensure that interest earned would not be offset against reimbursable interest expense. See Health Care Financing Administration, Department of Health & Human Services, Medicare Provider Reimbursement Manual §§ 226-228 (Jan.1983) [hereinafter "Manual "]. The transferred funds also were not otherwise segregated from monies that Mon Vale received from other sources.
 
 
 9
 The Vice President of Finance and Chief Financial Officer for both Monongahela and Mon Vale testified that Mon Vale used the bulk of the transferred funds to construct the oncology center. He testified that the remainder of the transferred funds was expended on Mon Vale's initial capitalization, its general operating costs, such as legal fees, and a partnership interest in an emergency treatment facility. According to the Vice President and Chief Financial Officer, a cash balance remained at Mon Vale following the construction of the oncology center and the purchase of the medical equipment.
 
 
 10
 II. THE STATUTORY SCHEME AND THE PROCEDURAL HISTORY
 
 A. The Statutory Scheme
 
 11
 Monongahela is a participant in the Medicare program, 42 U.S.C.A. §§ 1395-1395ccc (West 1983 & Supp. 1991), which provides health insurance for the aged and disabled. More specifically, Monongahela serves as a health care provider under Part A of the Medicare Act, 42 U.S.C.A. §§ 1395c-1395i-4 (West 1983 & Supp. 1991), which provides insurance, covering inpatient hospital care and related post-hospital home and hospice care, for eligible beneficiaries.[6] In order to become a Part A provider, see 42 U.S.C. § 1395x(u),[7] a hospital such as Monongahela must file a provider agreement with the Secretary pursuant to 42 U.S.C. § 1395cc.[8] Thereafter, a provider's contacts with the Secretary and the HCFA ordinarily are indirect, with all consultative services, communications, auditing, and reimbursements supplied through a private organization such as Blue Cross that the Secretary is authorized to appoint as a fiscal intermediary. See 42 U.S.C. § 1395h.[9]
 
 
 12
 Primarily at issue in this case is Blue Cross's--and, ultimately, the Secretary's--application of regulations that served to implement the Medicare Act prior to its amendment in 1983 to establish a prospective reimbursement system for Medicare providers of inpatient services. See 42 U.S.C. §§ 1395ww(d)-(e); see also Delaware County Memorial Hospital v. Bowen, 871 F.2d 10, 11 (3d Cir.1989) (discussing 1983 amendment of Medicare Act to provide for prospective reimbursement); Kean v. Heckler, 799 F.2d 895, 897 (3d Cir.1986) (same).[10] As originally enacted, the Medicare Act provided for "retroactive" reimbursements, based on the costs that hospitals providing care to Medicare beneficiaries actually had incurred. See 42 U.S.C. § 1395f(b)(1); see also Kean, 799 F.2d at 896-97 (describing retroactive approach for calculating reimbursements to hospitals prior to amendment of Medicare Act). Thus, under the regulations applicable in this case, fiscal intermediaries such as Blue Cross calculated the reimbursements owed to Medicare providers such as Monongahela by ascertaining the actual reasonable costs of services that already had been provided to Medicare beneficiaries.
 
 
 13
 A number of the regulations concerning the pre-amendment reimbursement of providers, based on reasonable costs, are relevant to this appeal. In offsetting calculated interest on the funds that Monongahela transferred to Mon Vale against the hospital's interest expense, Blue Cross (and the Secretary) applied regulations concerning costs to related organizations. The regulations provide that "costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization." 42 C.F.R. § 405.427(a), recodified at § 413.17(a) (1990). An organization is related to the provider if "the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities or supplies." 42 C.F.R. § 405.427(b)(1), recodified at § 413.17(b)(1) (1990). Under the regulations, the cost allowable to the provider--and its related organization--includes "[n]ecessary and proper interest on both current and capital indebtedness." 42 C.F.R. § 405.419(a)(1), recodified at § 413.153(a)(1) (1990). Such interest expense generally must be "[r]educed by investment income." 42 C.F.R. § 405.419(b)(2)(iii), recodified at § 413.153(b)(2)(iii) (1990). The regulations further provide, however, that "[i]ncome from funded depreciation ... is not used to reduce interest expense." Id.
 
 
 14
 The HCFA's Provider Reimbursement Manual for the time period at issue defines the funding of depreciation as "the practice of placing funds ... in a segregated account(s) for the acquisition of depreciable assets used in rendering patient care or for other capital purposes related to patient care." Manual, supra, at § 226. [App. 819] The Provider Reimbursement Manuallearly circumscribes the funds that, for purposes of avoiding an offset against interest expense, are to be regarded as funded depreciation. First, the funds "must be placed in readily marketable investments of the type that assures the availability and conservation of the funds." Id. Second, "[t]he action to fund depreciation must be approved by the appropriate managing body of the provider, such as the Board of Trustees or the Board of Directors, in accordance with the needs and objectives of management." Id. Third, "[t]he fund or funds must be clearly designated in the provider's records as funded depreciation accounts." Finally, "[f]unded depreciation ( [the] total market value of [the] fund) must be available ... on an as needed basis for the acquisition of the provider's depreciable assets used to render patient care, or for other capital purposes related to patient care." Id.
 
 
 15
 The applicable regulations require a provider such as Monongahela, at the close of its fiscal year, to submit to its fiscal intermediary a cost report setting forth both its total costs and the costs apportioned to Medicare. 42 C.F.R. § 405.406(b), recodified at § 413.20(b) (1990); § 405.453(f), recodified at § 413.24(f) (1990). The regulations further provide that the fiscal intermediary--in this case, Blue Cross--must review the cost report and perform an audit to determine the reasonable costs for which the provider is to be reimbursed. See 42 C.F.R. § 405.1801-03 (1990) (setting forth guidelines for provider reimbursement determinations).
 
 
 16
 Under the Medicare Act, a provider that is dissatisfied with its fiscal intermediary's determination of the amount of Medicare reimbursement that is due may appeal that determination to the Board. 42 U.S.C. § 1395oo(a). The decision of the Board constitutes the final agency decision, "unless the Secretary, on his own motion ... reverses, affirms, or modifies the Board's decision." 42 U.S.C. § 1395oo(f)(1). If dissatisfied with the decision of the Board and of the Secretary, a provider may obtain judicial review. Id.;[11] see also 5 U.S.C. §§ 701-706.
 
 B. The Procedural History
 
 17
 In terms of the offset of imputed interest on the funds that Monongahela transferred to Mon Vale for its capital construction and acquisition projects, the hospital's auditing history with its fiscal intermediary, Blue Cross, is checkered. For the first year in which Monongahela transferred funds to Mon Vale--FY 1983 (ending June 30, 1983)--Blue Cross requested detailed information concerning Monongahela's corporate restructuring and initially made an audit adjustment requiring an interest offset. After analyzing the restructuring and other audit information produced by Monongahela and Mon Vale, however, Blue Cross revised its Medicare reimbursement determination for FY 1983, eliminating the interest offset penalty that it initially had imposed for that year. This determination affecting Monongahela's Medicare reimbursement for FY 1983 occurred near the close of FY 1984 (ending June 30, 1984).
 
 
 18
 Monongahela's and Blue Cross's views of the reasons behind and the likely future effect of this revised reimbursement determination for FY 1983 differ considerably. The Vice President of Finance and Chief Financial Officer for the hospital and its parent testified that Blue Cross "made it perfectly clear to us that if the same circumstances existed in 1984 as in 1983 ... we wouldn't have any problems." Blue Cross, however, asserts that it eliminated the 1983 interest offset penalty because the HCFA had not yet informed intermediaries of its position on the validity of such offsets.
 
 
 19
 It is clear that, following Blue Cross's elimination of the interest offset penalty in Monongahela's FY 1983 reimbursement, the fiscal intermediary received an internal letter from the HCFA clarifying its position and stating that investment income must be offset against interest expense when funds are transferred from a provider to a parent organization. On the basis of the HCFA's interpretation of the regulations and the Provider Reimbursement Manual, Blue Cross, in its reimbursement audit for FY 1984, offset against Monongahela's interest expense the imputed interest on funds transferred to Mon Vale in the course of that fiscal year.
 
 
 20
 Monongahela subsequently appealed Blue Cross's FY 1984 reimbursement determination to the Board. The Board held that Blue Cross had correctly imputed--and offset--interest earnings on the approximately $5.6 million that Monongahela had transferred to Mon Vale for the capital projects, thereby reducing the hospital's FY 184 Medicare reimbursement by approximately $213,000.[12] The Board based this conclusion on the following findings:
 
 
 21
 [The] monies were not treated as a funded depreciation account, defacto or otherwise. The Provider did not treat the monies as funded depreciation prior to the transfer to Mon-Vale. The funds were transferred to Mon-Vale with the intention [that they] be used for three planned acquisitions not related to patient care. [Further,] [t]he Provider has not met the requirements [for funded depreciation accounts] in [the Provider Reimbursement Manual ] and 42 C.F.R. 405.419.
 
 
 22
 The Administrator of the HCFA, on behalf of the Secretary, affirmed the Board's decision. Addressing Monongahela's contention that the Board had erroneously applied 42 C.F.R. § 405.427--the regulation concerning costs to related organizations--to impute to the hospital interest earnings actually attributable to a separate corporation, the Administrator concluded that "[s]ince the provider is a wholly owned subsidiary, it clearly meets all of the criteria of being related to the parent company under the Medicare regulations and guidelines." The Administrator therefore determined that "the funds transferred to the parent company are still considered to be the provider's funds" and that "any investment income earned on those funds would be income to the provider." The Administrator further noted that the transferred funds, even if held in a funded depreciation account and thus subject to the exception to the interest offset rule, still would be attributable to Monongahela. The Administrator concluded, however, that "the funds in question did not meet the criteria to be classified as funded depreciation" and affirmed the Board's determination offsetting imputed interest earnings on the funds against Monongahela's allowable interest expense.
 
 
 23
 Having exhausted its administrative remedies, Monongahela filed a complaint against the Secretary in the district court, seeking reversal of the Board's and the Administrator's determinations and payment of the $213,000 reduction in Medicare reimbursement for FY 1984. Monongahela argued in the district court that, because Blue Cross's decision in FY 1983 not to offset imputed interest earnings on the transferred funds led the hospital, to its detriment and subsequent surprise, to take no action to segregate the funds in an actual funded depreciation account, the Secretary was estopped from applying the interest offset rule in FY 1984. In addition, Monongahela contended, as it had before the Board and in comments to the Administrator, that any interest earned on funds transferred to Mon Vale should not be imputed to the hospital and that, at all events, the transferred funds constituted a de facto funded depreciation account.
 
 
 24
 Noting that it is not entirely clear whether estoppel can be applied against the government, see Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) [hereinafter Crawford ], the district court found it unnecessary to resolve that issue. See 728 F.Supp. at 1175. The court concluded that, even assuming that estoppel could be applied against the government, "the Secretary cannot be bound by the statements of the Fiscal Intermediary and, charged with this knowledge, the Hospital could not have reasonably relied on such statements." Id. The court further noted that a fiscal intermediary's determination may, within three years, be reopened and adjusted, see 42 C.F.R. § 405.1885 (1990), rendering any immediate reliance on the determination unreasonable. See id. at 1176. The court also concluded that Monongahela could establish no detrimental reliance on Blue Cross's audit for FY 1983 in managing its funds during FY 1984, because Blue Cross had, only several days prior to the close of Monongahela's 1984 fiscal year, arrived at its ultimate determination that no interest-offset penalty should be imposed for FY 1983. See id. In sum, the court concluded that Monongahela's equitable estoppel theory was, under the circumstances, unavailing.
 
 
 25
 The district court quickly dispensed with Monongahela's contention that the Secretary (and the Board) had erroneously interpreted and applied the regulations concerning related organizations and the offset of interest earnings against interest expense. The court observed that, read literally, 42 C.F.R. § 405.427, which concerns the costs of a parent or other related organization that are attributable to a provider for purposes of Medicare reimbursement, "has no direct application to the present case in which the Secretary seeks to reduce the provider's reimbursement by offsetting certain earnings of the parent." Id. The court concluded, however, that if the properly incurred costs of a related organization are reimbursable to the provider, "[i]n fairness, the reverse should also be true." Id. at 1177. In short, the district court concluded that the Secretary reasonably had interpreted section 405.427 to provide for attributing to a provider a related organization's interest earnings, as well as interest expense. See id. at 1176-77. The court, moreover, determined that Mon Vale is Monongahela's controlling parent and, as such, a "related organization" within the meaning of section 405.427. Id. at 1177-78.
 
 
 26
 The district court, however, also concluded that the Secretary's (and the Board's) application of 42 C.F.R. § 405.419, setting forth exceptions to the interest-offset rule, was not based on substantial evidence. Id. at 1179. The court observed that the construction and acquisition projects that Mon Vale undertook on Monongahela's behalf, as evidenced by the Department of Health's approval of them, "were undoubtedly necessary for patient care." Id. at 1178. The court conceded that "the funding and ultimate purchase of [Monongahela's] depreciable assets did not comply with the regulatory requirements of the Secretary for funded depreciation accounts" and that the transferred funds were neither "specifically earmarked for the projects" nor "segregated and designated for funded depreciation." Id. The court nonetheless held, however, that the transfer of the funds was "consistent with the spirit and purpose" of funded depreciation and that the transfer of the funds "created a de facto funded depreciation account." Id. As a result, the court held that the Secretary must "attempt to place plaintiff in the position it would have been in if it had created a funded depreciation account to accomplish the projects at issue instead of using Mon Vale as a conduit," remanding the case for determination of the amount of interest that should be exempt from the interest offset rule. See id. at 1179.[13]
 
 III. JURISDICTION
 
 27
 In view of the district court's remand to the agency, Monongahela has moved to dismiss this appeal for want of a "final decision" under 28 U.S.C. § 1291. The Supreme Court's recent decision in Sullivan v. Finkelstein, --- U.S. ----, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990), is central to our resolution of this issue.
 
 
 28
 Finkelstein held that a district court's order remanding a spouse's claim for disability insurance benefits to the Secretary of HHS for reconsideration without regard to the applicable regulations, which the order essentially invalidated, was immediately appealable as a final decision under 28 U.S.C. § 1291. Id. at 2681. In Finkelstein, the Court closely analyzed 42 U.S.C. § 405(g), which governs judicial review of the Secretary's decisions granting or denying benefits under the Social Security Act.[14] See id. 110 S.Ct. at 2663-64. The Court determined that section 405(g) provides for two types of remands: (1) a final judgment, accompanied by a remand; and (2) a remand for further factfinding or similar proceedings prior to the entry of a final judgment. See id. Setting forth a number of criteria for its decision, the Court concluded that the order remanding the case to the Secretary for rehearing constituted a "judgment" within the meaning of section 405(g), and therefore a "final decision" under section 1291.
 
 
 29
 Monongahela contends that Finkelstein 's holding must be confined to its statutory context and does not permit review in this case. Monongahela asserts that Finkelstein applies only to disability benefits appeals pursuant to section 405(g) of the Social Security Act--and not to Medicare reimbursement appeals under section 1395oo(f)(1). In support of this argument, the hospital emphasizes that an action seeking judicial review of a final decision of the Board or the Secretary concerning Medicare reimbursement
 
 
 30
 shall be brought in the district court of the United States ... and shall be tried pursuant to the applicable provisions under chapter 7 of Title 5 [the Administrative Procedure Act, 5 U.S.C. §§ 701-706], notwithstanding any other provisions in section 405 of this title.
 
 
 31
 42 U.S.C. § 1395oo (f)(1) (emphasis added). Monongahela interprets this exclusionary reference to section 405 in section 1395oo (f)(1) to preclude the application of Finkelstein in resolving the jurisdictional issue presented here. Monongahela further contends that, whereas the district court in Finkelstein effectively invalidated the applicable regulations, the district court in this case "merely directed the Secretary to apply a regulation already in place to the factual situation at hand."
 
 
 32
 In addition, Monongahela emphasizes the principle that a decision is final under section 1291 only when that decision " 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " Van Cauwenberghe v. Biard, 486 U.S. 517, 521, 108 S.Ct. 1945, 1949, 100 L.Ed.2d 517 (1988) (quoting Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). Based in part on the Supreme Court's observation in Sullivan v. Hudson, 490 U.S. 877, 109 S.Ct. 2248, 2254-55, 104 L.Ed.2d 941 (1989), that a decision remanding a Social Security benefits case to the Secretary often will not become final "until after the result of the administrative proceedings is known," Monongahela argues that this appeal is interlocutory in nature.[15]
 
 
 33
 In sharp contrast to Monongahela, the Secretary argues that the district court's order in the present case is "legally identical" to the order at issue in Finkelstein. Acknowledging that section 1395oo (f)(1) does not contain the specific permissive language contained in section 405(g), the Secretary nonetheless contends that both judicial review provisions permit a district court, as the Finkelstein Court concluded with respect to section 405(g), to "enter a judgment 'with or without remanding the cause for a rehearing.' " 110 S.Ct. at 2663-64 (quoting 42 U.S.C. § 405(g)) (emphasis omitted). In sum, the Secretary urges that, in determining whether appellate jurisdiction exists under Finkelstein in this case, it is irrelevant that section 1395oo (f), as opposed to section 405(g), governs judicial review. We agree with the Secretary that Monongahela's reading of Finkelstein and of the controlling statutory framework is unduly narrow.
 
 
 34
 Monongahela's focus on the language of section 1395oo (f)(1) in its motion to dismiss this appeal is not without merit. The Finkelstein Court's close examination of section 405(g) suggests that the statute providing for judicial review of an agency's actions is central to the determination whether a district court decision remanding a case to the agency constitutes a final decision under section 1291. See 110 S.Ct. at 2663-64; see also Melkonyan v. Sullivan, --- U.S. ----, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991) (closely analyzing types of agency remands for which section 405(g) provides in determining when final judgment is rendered for purposes of commencing filing period for attorney fees and expenses under Equal Access to Justice Act). We cannot agree with Monongahela, however, that either the exclusionary reference to section 405(g) or other language in section 1395oo (f)(1) and in the Administrative Procedure Act (the "APA") precludes the application of Finkelstein 's holding to this case.
 
 
 35
 As Monongahela emphasizes, see supra at 585-586, section 1395oo (f)(1) provides that actions seeking judicial review of Medicare reimbursement determinations are to be tried in accordance with the APA, "notwithstanding any other provisions in section 405." However, in determining whether the district court's remand constitutes a final decision under section 1291, we take this direction simply to mean that we must seek a definition of a final, appealable judgment in section 1395oo (f)(1) and in the APA--and not in section 405(g). Unfortunately, in contrast to section 405(g), quoted supra at note 14, neither section 1395oo (f)(1) nor the APA contains language distinguishing between a judgment accompanied by a remand and a remand for further proceedings to be followed by a judgment. Section 1395oo (f)(1), see supra note 11, simply states that a provider aggrieved by the Board's or the Secretary's final reimbursement determination "shall have the right to obtain judicial review ... by a civil action." 42 U.S.C. § 1395oo (f)(1). The APA analogously provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action ... is entitled to judicial review thereof." 5 U.S.C. § 702. The APA otherwise is silent as to whether and what types of remands to an agency constitute final judgments. See 5 U.S.C. §§ 701, 703-706.
 
 
 36
 We nonetheless conclude that, as a practical matter, section 1395oo (f)(1) permits the same types of remands as section 405(g). We agree with Monongahela that certain remands under section 1395oo (f)(1) may be akin to the remands for further factfinding discussed in Sullivan v. Hudson, supra, 109 S.Ct. at 2254-55, and thus must be regarded as preceding a final judgment that will depend upon the agency's subsequent actions. We further note, however, that this Circuit, as well as others, has at least implicitly interpreted a decision rendered under section 1395oo (f)(1), resolving all legal issues and remanding to the agency only for implementation of that decision, as a final decision immediately appealable under section 1291. See, e.g., Monsour Medical Center v. Heckler, 806 F.2d 1185 (3d Cir.1986) (implicitly holding that district court decision, pursuant to section 1395oo (f)(1), setting aside Secretary's Medicare Reimbursement determination as insufficiently supported and remanding with directions to reimburse provider for costs at issue, constituted final, appealable judgment), cert. denied, 482 U.S. 905, 107 S.Ct. 2481, 96 L.Ed.2d 373 (1987); Georgetown University Hospital v. Sullivan, 934 F.2d 1280 (D.C.Cir.1991) (implicitly holding that district court decision, rendered under section 1395oo (f)(1), invalidating Secretary's interpretation of amendments to Medicare Act and remanding for implementation of judgment, constituted final decision appealable under section 1291); Daviess County Hospital v. Bowen, 811 F.2d 338 (7th Cir.1987) (explicitly holding that district court decision, pursuant to section 1395oo (f)(1), reversing Board's provider reimbursement determination and remanding for calculation of amount owed in view of judgment, constituted final decision immediately appealable under section 1291).
 
 
 37
 The foregoing analysis clears the way for application of Finkelstein, which we hold controls the resolution of the jurisdictional issue presented by this appeal. We conclude, more specifically, that we must apply the criteria that the Finkelstein Court set forth in determining that the decision at issue constituted a final decision under section 1291:
 
 
 38
 The District Court's remand order was unquestionably a "judgment," as it terminated the civil action challenging the Secretary's final determination that respondent was not entitled to benefits, set aside the determination, and finally decided that the Secretary could not follow his own regulations in considering the disability issue. Furthermore, should the Secretary on remand undertake the inquiry mandated by the District Court and award benefits, there would be grave doubt ... whether he could appeal his own order.
 
 
 39
 110 S.Ct. at 2664.
 
 
 40
 We conclude at the outset that, contrary to Monongahela's contention that this appeal is interlocutory in nature, the district court's decision effectively "terminated the civil action challenging the Secretary's determination"--in this case, that Monongahela was not entitled to application of the funded depreciation exception to the investment income offset rule and, thus, that Monongahela's interest expense must be reduced by imputed interest on the funds transferred to Mon Vale. Id. In this connection, Finkelstein makes clear that it is immaterial that the district court's decision did not establish the reimbursement amount owed to the hospital for FY 1984. The district court decision at issue in Finkelstein did not specify the amount, if any, of disability benefits due to the claimant. See Finkelstein v. Bowen, 869 F.2d 215, 220 (3d Cir.1989) (noting that, pending results of remand, plaintiff claimant has "no vested right in anything"), rev'd --- U.S. ----, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990). Thus, as the Secretary argues, "the fact that the order here does not finally determine the amount of reimbursement cannot be a sufficient basis, by itself, to render the order unappealable."
 
 
 41
 Further, notwithstanding Monongahela's contention that the district court simply required the Secretary to apply the regulation governing funded depreciation to the facts at hand, we think that the district court's order, like the order at issue in Finkelstein, "set aside the [Secretary's] determination" and precluded the Secretary from applying the applicable regulatory requirements. 110 S.Ct. at 2664. It is true that, whereas the applicable requirements in Finkelstein were set forth in a regulation, the funded depreciation requirements at issue in this case, discussed supra at 581-582, are contained in the Secretary's Provider Reimbursement Manual interpreting the funded depreciation regulation. At least for purposes of determining appealability, however, we think that this is a distinction without a difference.
 
 
 42
 Here, as in Finkelstein, the district court determined that the plaintiff had failed to establish that it met the Secretary's articulated requirements. Thus here, in strong analogy to Finkelstein, the district court's decision precludes the Secretary from applying the Provider Reimbursement Manual 's requirements for determining whether funds devoted to a given purpose qualify as a funded depreciation account that is subject to the exception to the interest offset rule. Although Monongahela contends that the district court's decision is so fact specific that it can pose no threat to the administration of the Medicare program, we conclude that the decision effectively strikes down important provisions of the Provider Reimbursement Manual, establishing a precedent that, in the absence of an appeal, is likely to create considerable administrative problems for the Secretary.
 
 
 43
 The final--and critical--similarity between this case and Finkelstein is that, if an immediate appeal is not permitted, the Secretary may be unable to obtain judicial review of the district court's disposition of the legal issue presented in this case.[16] The questions that the district court directed the Secretary to resolve on remand, see supra at note 13, concern the amount of transferred funds that Monongahela should be regarded as sequestering in a funded depreciation account. The district court's remand instructions therefore appear to preclude the Secretary from determining that none of the sums that Monongahela transferred to Mon Vale qualify for the funded depreciation exception to the interest offset rule. If the hospital is satisfied with the Secretary's determination of the amount of transferred funds that qualify as funded depreciation, therefore, the Secretary will be unable to appeal the legal issue resolved by the district court's remand decision.
 
 
 44
 In sum, we hold that Finkelstein controls, that Finkelstein 's appealability requirements are satisfied, and that we have jurisdiction over this appeal.
 
 IV. EQUITABLE ESTOPPEL
 
 45
 Monongahela contends on appeal, as it did before the district court, that the Secretary is equitably estopped, in his Medicare reimbursement determination for FY 1984, from offsetting against the hospital's interest expense the imputed interest on the funds transferred to Mon Vale. Monongahela's estoppel argument has a facial appeal. The Secretary's failure to clarify earlier for fiscal intermediaries HHS's position on the application to related organizations of the agency's funded depreciation rules, which led to Blue Cross's FY 1983 determination that an interest offset was unnecessary in Monongahela's case, and its quick about-face in FY 1984, hardly represents good public administration. We agree with the district court, however, that Monongahela's estoppel argument is devoid of any legal or factual basis.
 
 
 46
 We conclude, first, that Monongahela's estoppel argument is foreclosed by Office of Personnel Management v. Richmond, --- U.S. ----, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), which held that the government, despite the erroneous oral and written representations of a federal employee, was not equitably estopped from determining that a claimant who exceeded the statutory limit on earnings was ineligible for disability benefits. In Richmond, the Supreme Court concluded:
 
 
 47
 Whether there are any extreme circumstances that might support estoppel in a case not involving payment from the Treasury is a matter we need not address. As for monetary claims, it is enough to say that this Court has never upheld an assertion of estoppel against the Government by a claimant seeking public funds. In this context, there can be no estoppel, for courts cannot estop the Constitution.
 
 
 48
 Id. 110 S.Ct. at 2476; see also Crawford, 467 U.S. at 60, 104 S.Ct. at 2224 (declining to adopt "a flat rule that estoppel may not in any circumstances run against the government," but suggesting that such circumstances will be extremely rare). Under Richmond, it thus is clear that, absent extreme circumstances, Monongahela cannot invoke equitable estoppel against the Secretary in asserting its claim to $213,000 in additional Medicare reimbursement for FY 1984. As is apparent from the discussion that follows, we believe that no such extreme circumstances exist in this case.
 
 
 49
 We further conclude that, even if Richmond did not preclude estoppel here, the district court correctly determined that Monongahela otherwise has failed to meet the requirements for invoking equitable estoppel. As the district court indicated, 728 F.Supp. at 1175, Crawford held that a private party who seeks to invoke equitable estoppel against the government "surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present." 467 U.S. at 61, 104 S.Ct. at 2224; see also Lyng v. Payne, 476 U.S. 926, 935, 106 S.Ct. 2333, 2339, 90 L.Ed.2d 921 (1986) (noting Crawford 's holding). In United States v. Asmar, 827 F.2d 907, 912 (3d Cir.1987), we distilled, as follows, the traditional elements of equitable estoppel set forth by the Crawford Court: "[T]o succeed on a traditional estoppel defense the litigant must prove (1) a misrepresentation by another party; (2) which he reasonably relied upon; (3) to his detriment." We concluded, moreover, that "[t]his court ... has identified a fourth element that must be proven when a party alleges estoppel against the government," namely, "affirmative misconduct." Id.; see also United States v. St. John's General Hospital, 875 F.2d 1064, 1069 (3d Cir.1989) (noting four elements that must, under Asmar, be established before equitable estoppel will run against the government).
 
 
 50
 With respect to the first element that must be established in invoking equitable estoppel, Monongahela contends that Blue Cross, in eliminating the initial interest offset penalty in the hospital's Medicare reimbursement for FY 1983, misrepresented that no imputed interest on funds transferred to Mon Vale in FY 1984 would be offset against Monongahela's reimbursable interest expense for that year. Even assuming that Blue Cross's statements constituted misrepresentation, however, we agree with the district court that Monongahela has failed to establish the second element of equitable estoppel--reasonable reliance. Because a fiscal intermediary can neither definitively interpret regulations nor make policy pronouncements, Monongahela's contention that it reasonably relied on Blue Cross's representation concerning interest offset for FY 1984, in the words of the district court, "misapprehends the nature of the relationship between the Fiscal Intermediary and the Secretary." 728 F.Supp at 1175. Further, as the district court noted, the Hospital had to have been aware that Medicare audits are subject to reopening and adjustment for a three year period and that "nothing was written in stone with the 1982-83 audit." Id.
 
 
 51
 With respect to the third element of establishing equitable estoppel against the government, we agree with the district court that Monongahela could not actually have relied, to its detriment, on Blue Cross's interest offset representations concerning FY 1984. The district court found that "[t]he 1982-1983 audit was completed only four days before the end of the 1983-84 fiscal year." 728 F.Supp. at 1176 (emphasis in original). It therefore is difficult to see how Blue Cross's FY 1983 reimbursement redetermination, and any oral representations accompanying it, could have influenced the manner in which Monongahela structured its financial transactions with Mon Vale in the course of FY 1984. As the district court concluded, "[h]aving placed all its eggs in one basket, hoping to convince the Fiscal Intermediary that its interpretation was wrong, the Hospital cannot complain now that the basket was broken." Id. Further, Monongahela's claim that it was caught by surprise and would have conducted its affairs differently had it known how the Secretary would rule plainly is insufficient to establish detrimental reliance under the Supreme Court's decision in Crawford.[17]
 
 
 52
 Finally, we think that it is clear that Monongahela cannot establish affirmative misconduct, this Circuit's fourth element of equitable estoppel against the government. Monongahela contends that the Secretary retroactively--and therefore improperly--applied a new policy concerning interest offsets and related organizations. Monongahela argues that the HCFA's internal letter clarifying its position on this issue, see supra at 583, marked a sudden change in the Secretary's interpretation of the related organization and funded depreciation regulations. Monongahela grounds this argument in the testimony of a Medicare field auditor for Blue Cross. According to Blue Cross, the field auditor's testimony establishes that the internal letter was the first notice of the "change in policy" relating to whether imputed interest on funds that a provider has transferred to a parent organization should be offset against the provider's interest expense. Monongahela contends that the auditor's testimony also shows that Blue Cross wrongfully failed to inform any institution or provider of this significant change in a timely fashion and, thus, that it was only in August of 1985, in the course of Blue Cross's audit for FY 1984, that the hospital, Mon Vale, and their certified public accountant, Arthur Andersen, which represents many health care providers, learned of it.
 
 
 53
 Although the Secretary and Blue Cross failed to clarify HHS's position on the application of the interest offset rule to related organizations, this failure does not amount to affirmative misconduct. Contrary to Monongahela's assertions, we conclude that the HCFA's internal letter does not amount to an abrupt change in a clear agency policy.[18] That Blue Cross initially offset interest on the funds that Monongahela had transferred to Mon Vale in FY 1983 demonstrates, at the very least, that no firm agency interpretation of the funded depreciation regulation in the context of related organizations existed. Moreover, the field auditor upon whose testimony Monongahela relies, stated that Blue Cross regarded the position announced in the internal letter as a confirmation of the intermediary's existing approach to applying the relevant regulations, as not particularly significant; and, therefore, as simply one of the many constant changes in the administration of the Medicare program of which it would be impossible to inform every provider. In sum, with respect to this as well as to the other traditional requirements for establishing equitable estoppel, Monongahela's argument misses the mark.V. THE INTEREST OFFSET RULING
 
 
 54
 As we have explained, see supra at 581-582, the Medicare regulations, as interpreted by the Secretary, permit reimbursement of a provider's interest expense, but only as offset against investment income, unless that income falls within the exception for funded depreciation. The regulations thus limit a provider's reimbursement for interest expense to the net cost of borrowing. In this context, the Secretary has interpreted the regulations that permit reimbursement of costs incurred by organizations related to the provider to require that investment income earned by a related organization be offset against a provider's interest expense.
 
 
 55
 It is hornbook law that the regulatory interpretation of a statute by the agency charged with administering it must be given great deference. See Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); Zenith Radio Corporation v. United States, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). Further, "[a]n agency's construction of its own regulations has been regarded as especially due that respect." Milhollin, 444 U.S. at 566, 100 S.Ct. at 797. Thus, we have observed that "[t]he Supreme Court has made clear that courts must defer to an agency's consistent interpretation of its own regulation unless it is 'plainly erroneous or inconsistent with the regulation.' " Director, Office of Workers' Compensation Programs v. Mangifest, 826 F.2d 1318, 1323 (3d Cir.1987) (quoting Seminole Rock & Sand Co., 325 U.S. at 414, 65 S.Ct. at 1217); see also Bonessa v. United States Steel Corp., 884 F.2d 726, 731-32 (3d Cir.1989) (noting that this Circuit in Mangifest "acknowledged the Supreme Court's mandate that courts must defer to an agency's consistent interpretation of its own regulations"); Presinzano v. Hoffman-La Roche, Inc., 726 F.2d 105, 111 (3d Cir.1984) ("[A]n agency's interpretation of its own regulations is owed considerable deference.").
 
 
 56
 As we have discussed, see supra, at 585, 586, we must conduct our review of the Secretary's reimbursement determination in this case in accordance not only with section 1395oo (f)(1), but also with the APA. In Butler County Memorial Hospital v. Heckler, 780 F.2d 352 (3d Cir.1985), a Medicare reimbursement case similar to this one, we recognized that the APA "requires that a court uphold agency policies, including those pronounced in adjudications such as [the Secretary's Medicare reimbursement determinations] ..., unless they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' " Id. at 355 (citing 5 U.S.C. §§ 551(13), 701 and quoting 5 U.S.C. § 706(2)(A)). In Butler County Memorial Hospital we further concluded:
 
 
 57
 Such deference is especially appropriate here, where the Secretary's resolution involves a complex scheme of reimbursement.... Congress described only sparsely the means of assessing reasonable costs owed to Medicare providers, and instead assigned the primary responsibility for such assessments to the Secretary.... We must be cautious lest we disturb this appropriate allocation of governmental functions.
 
 
 58
 Id. at 356 (citations omitted).
 
 
 59
 With these principles in mind, we turn to the district court's related organization and funded depreciation rulings.
 
 
 60
 A. The Relationship of Plaintiff and Mon Vale
 
 
 61
 We agree with the district court that the Secretary correctly determined that Monongahela is "controlled by" Mon Vale and that the two entities thus are "related organizations" within the meaning of section 405.427(b)(1) of the regulations. Monongahela is a wholly owned subsidiary of Mon Vale and, as such, is subject to its control. Monongahela does not challenge the validity of this regulation, to which we owe deference, and, indeed, appears to concede on appeal that it and Mon Vale qualify as related organizations.
 
 
 62
 We also conclude that the district court correctly determined that, under section 405.427(b)(1) and section 405.419(b)(1), the Secretary was entitled to attribute to Monongahela for offset purposes the imputed interest on the funds that the hospital transferred to Mon Vale. As we have noted supra, at 584, the district court concluded that, although section 405.427(b)(1) facially concerns the reimbursable costs of a related organization such as Mon Vale, the regulation should, in fairness, be interpreted in conjunction with section 405.419(b)(1) to permit the Secretary to attribute the interest income of a related organization to a provider, in addition to the organization's interest expense, in calculating the provider's Medicare reimbursement. We hold that this interpretation of the relevant regulations is neither " 'plainly erroneous [nor] inconsistent.' " Mangifest, 826 F.2d at 1323 (citation omitted). We also hold that the Secretary's policy of imputing a related organization's interest income to a provider in applying the interest offset rule, as announced in the rulings of the Board and the Administrator of the HCFA, is not arbitrary, capricious, an abuse of discretion, or otherwise unlawful. See Butler County Memorial Hospital, 780 F.2d at 355.
 
 B. The Funded Depreciation Ruling
 
 63
 The Medicare regulations and interpretive rules involved in this appeal encourage providers to establish funded depreciation accounts to conserve funds for the replacement of depreciable assets used in patient care. See 42 C.F.R. § 405.415(e), recodified at § 413.134(e) (1990).[19] As an incentive, section 405.419 of the regulations provides that income from investments devoted to the replacement of depreciable assets used in providing patient care shall not be offset against reimbursable interest expense. As the court noted in Phoenix Baptist Hospital and Medical Center, Inc. v. Heckler, 767 F.2d 1304 (9th Cir.1985), "[t]he Medicare program benefits from providers' funding depreciation because the funding reduces replacement costs for worn out equipment by eliminating interest expense on providers' loans.", id. at 1307. The concept of funded depreciation, however, requires that providers firmly commit to use clearly identified funds only for the acquisition of depreciable assets or other capital purposes related to patient care. Thus, the Secretary, in the Provider Reimbursement Manual, interpreted section 405.419 to impose two crucial requirements on providers seeking to shelter funds from the regulation's interest offset rule: (1) the clear identification and segregation of funds; and (2) the commitment that the funds will be devoted exclusively to "the acquisition of depreciable assets used in rendering patient care or for other capital purposes related to patient care." Manual at § 226. Consistent with these core requirements, the Secretary evolved the four further requirements pertaining to funded depreciation accounts that we have discussed supra, at 582.
 
 
 64
 Monongahela concedes that neither it nor Mon Vale placed the transferred funds in a funded depreciation account, in compliance with the Secretary's regulations and the Provider Reimbursement Manual. More specifically, the manner in which Monongahela and Mon Vale handled the transferred funds failed to satisfy either of the two crucial elements in the establishment of a funded depreciation account: (1) they were not clearly identified and segregated from general funds; and (2) there was no commitment that the funds would be used only for certain purposes related to patient care. Indeed, as we have discussed, see supra at 580, at least some of the transferred sums clearly were not devoted to the exclusive purposes for which funded depreciation accounts are to be established and were instead expended on Mon Vale's initial capitalization and general operating expenses, including legal costs.
 
 
 65
 Monongahela argues--and the district court agreed--that it should receive a dispensation from the Secretary's rigorous requirements for funded depreciation accounts because (1) Mon Vale served as nothing more than a conduit for the replacement and acquisition of capital assets devoted to patient care; (2) the majority of the sums that Monongahela transferred to Mon Vale ultimately were used, as required, to fund depreciation; and (3) the projects that Mon Vale carried out for Monongahela with the transferred funds comported with the spirit and the purpose of a funded depreciation account. Although we understand the district court's sympathetic attitude toward an eleemosynary institution that serves an economically depressed region of Pennsylvania with considerable distinction, we are constrained to reverse on this point.
 
 
 66
 We must defer to the Secretary's interpretation of the Medicare Act as embodied in section 405.419, which sets forth the interest offset rule and its funded depreciation exception. Indeed, the validity of this regulation is in no way challenged on this appeal. Further, because they neither are plainly erroneous nor inconsistent with section 405.419, the Provider Reimbursement Manual 's funded depreciation requirements, which construe section 405.419, are "especially due that respect." Milhollin, 444 U.S. at 566, 100 S.Ct. at 797; see also St. Mary's Hospital v. Blue Cross and Blue Shield Association, 788 F.2d 888 (2d Cir.1986) (upholding funded depreciation rulings on deferential grounds); Phoenix Baptist Hospital, 767 F.2d at 1306 (same).
 
 
 67
 In so holding, we our mindful of our conclusion in Butler County Memorial Hospital, 780 F.2d at 356, that deference is particularly appropriate in the context of the complex scheme of Medicare reimbursement, for the regulation and adjudication of which the Secretary has been given primary responsibility. The Secretary's interpretation of section 405.419 is designed to avoid the difficult case-by-case determinations that the result reached by the district court would require. Clearly, it would be expensive and wasteful to impose on the Secretary, in numerous cases, the burden of tracing funds that a provider has transferred without restrictions to a related organization to determine whether those funds have, in fact, been used to fund the acquisition and replacement of depreciable assets used in patient care. We think that the courts properly have been solicitous of the Secretary's discretion "to control excessive costs by adopting general prophylactic rules which, despite their inherent imprecision, eliminate the need for a cumbersome and expensive process of adjudicating item-by-item the reasonableness of costs." Marina Mercy Hospital v. Harris, 633 F.2d 1301, 1304 (9th Cir.1980); see also St. Mary's Hospital, 788 F.2d at 890 (quoting same); Friedman v. Heckler, 765 F.2d 383, 387 (2d Cir.1985) (quoting same).
 
 
 68
 In this complex area of regulation, ad hoc determinations, invocations of the "spirit and purpose" of the regulations, and "rough justice," however appealing, simply will not do. The Secretary's determination that Monongahela failed to meet the funded depreciation requirements, and therefore that $213,000 must be deducted from the hospital's Medicare reimbursement for FY 1984 as a result of the application of the interest offset rule, must be upheld.[20]VI. CONCLUSION
 
 
 69
 For the foregoing reasons, the order of the district court will be reversed insofar as it: (1) determined that the funds transferred from Monongahela to Mon Vale constitute a funded depreciation account; and (2) remanded the case to the Secretary to attempt to place plaintiff in the position it would have been in had it created a funded depreciation account. In all other respects, the order of the district court will be affirmed.
 
 
 
 [1]
 As is discussed infra, at 580-581, the Medicare Act has been amended to establish a prospective payment system for reimbursing hospitals that provide care for Medicare beneficiaries
 
 
 [2]
 The regulations relevant to this appeal have been recodified. See Redesignation Table XIII, 42 C.F.R. §§ 400-429 (1989), at 720. Parallel citations have been supplied in the initial citations to the relevant regulations; all subsequent citations are to the older codification in effect at the times relevant to this appeal
 
 
 [3]
 The factual background is drawn from the district court's opinion, see Monongahela Valley Hospital v. Bowen, 728 F.Supp. 1172-1175 (W.D.Pa.1990), and from the record
 
 
 [4]
 This reorganization resulted from an 18-month study that Monongahela's board of trustees undertook to determine whether corporate restructuring would better enable the hospital to serve the health care needs of its community. The restructuring was designed to give the hospital greater regulatory and financing flexibility, to provide it with new management options, to protect its assets from liability arising from new ventures, and to ensure that unrelated business income would not endanger its tax-exempt status
 
 
 [5]
 The Vice President for Finance and Chief Financial Officer of Monongahela and Mon Vale testified that difficulties that the hospital was experiencing in negotiating a new labor contract, as well as contemporaneous changes in the Medicare regulations, led the two corporations to defer the decision as to which organization was best suited to own and operate the center
 
 
 [6]
 Part B of the Medicare Act constitutes a voluntary, federally subsidized health insurance program that provides supplementary benefits covering physician and outpatient services to aged and disabled persons who enroll and pay premiums. See 42 U.S.C.A. §§ 1395j-1395w-4 (West 1983 & Supp.1991); see also American Ambulance Service v. Sullivan, 911 F.2d 901, 903 (3d Cir.1990) (discussing Part B of the Medicare Act); Medical Fund-Philadelphia Geriatric Center v. Heckler, 804 F.2d 33, 35 (3d Cir.1986) (same). Part B of the Medicare program is not at issue in this case
 
 
 [7]
 42 U.S.C. § 1395x(u) states: "The term 'provider of services' means a hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, or home health agency, [or] hospice program...."
 
 
 [8]
 42 U.S.C.A. § 1395cc describes the agreement that a health care facility must enter into with the Secretary in order to become eligible for payments for services rendered to Medicare beneficiaries under Part A of the Medicare Act. A prospective provider must agree, inter alia, to comply with the detailed provisions of section 1395cc concerning the manner in which Medicare beneficiaries are to be charged; the return of monies incorrectly collected from beneficiaries; the release of patient data to the Secretary; and, in the case of hospitals providing inpatient services, peer review procedures to ensure quality control. Section 1395cc also contains provisions concerning the termination and modification of provider agreements
 
 
 [9]
 42 U.S.C.A. § 1395h authorizes the Secretary to appoint public or private agencies or organizations to facilitate payments to Medicare providers. Section 1395h also sets forth in detail the procedures for appointing Medicare fiscal intermediaries and the subsequent obligations of such intermediaries
 
 
 [10]
 The amended statutory scheme is not at issue in the present appeal
 
 
 [11]
 42 U.S.C. § 1395oo (f)(1) states that "[p]roviders shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action...."
 
 
 [12]
 The Board additionally determined, as Blue Cross conceded, that imputed interest earnings in the amount of $9,724, which Monongahela had shown to constitute interest on unrestricted donations, should not be included in the interest offset. Monongahela does not take issue with that ruling
 
 
 [13]
 The court stated:
 "The present record leaves many unanswered questions. Did plaintiff exceed the limit on amounts that can be sheltered in a funded depreciation account? Because the project funds were commingled with Mon-Vale's operating funds, how much is properly treated as funded depreciation? What has happened to the interest earned on these funds? If the interest was not spent on the projects, does the Medicare program require that it be retained in a funded depreciation account for future projects?"
 
 
 [728]
 F.Supp. at 1179
 
 
 [14]
 42 U.S.C. § 405(g) provides in relevant part:
 Any individual, after any final decision of the Secretary made after a hearing to which he was a party, ... may obtain a review of such decision by a civil action.... The court shall have power to enter ... a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.... The court may, on motion of the Secretary made for good cause shown ..., remand the case to the Secretary for further action by the Secretary, and it may at any time order additional evidence to be taken before the Secretary ...; and the Secretary shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm his findings of fact or his decision, or both, and shall file with the court any such additional and modified findings of fact and decision.... The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions.
 
 
 [15]
 Monongahela further asserts that this appeal does not fall within the small class of interlocutory decisions that are appealable under the collateral order doctrine. See Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1945) (enunciating collateral order doctrine applicable to "small class" of cases). The Secretary argues, in opposition, that if Finkelstein does not confer appellate jurisdiction, the collateral order doctrine does. In view of our conclusion, infra, that Finkelstein controls appealability in this case, there is no need to reach that issue
 
 
 [16]
 We think that our suggestion in Finkelstein, 869 F.2d at 217 (citation omitted), that remands to administrative agencies should be appealable in "cases in which an important legal issue is finally resolved and review of that issue would be foreclosed 'as a practical matter' if an immediate appeal were unavailable" is apposite in this context. As we have noted, however, the Supreme Court, in its opinion vacating our earlier decision, 110 S.Ct. at 2264-65, pointed out that remands to an agency merely to receive further evidence, without vacating or setting aside the agency's decision on the merits, clearly are not appealable
 
 
 [17]
 Crawford was a Medicare reimbursement case that involved certain government misrepresentations. The provider alleged that, over the course of three years, the fiscal intermediary repeatedly had informed it that employee salaries that were paid with funds from a federal grant issued under the Comprehensive Employment and Training Act ("CETA") also were reimbursable under Medicare. 467 U.S. at 55-57, 104 S.Ct. at 2221-22. HHS subsequently informed its fiscal intermediaries that the salaries of CETA employees were not reimbursable. Id. at 57, 104 S.Ct. at 2222. The provider's cost reports for the preceding three years at that point were reopened, the reimbursable costs recomputed, and the salaries subtracted from the provider's reimbursement. Id. at 57-58, 104 S.Ct. at 2222-23. The Supreme Court suggested that the provider could not reasonably have relied on the misrepresentations of its fiscal intermediary and held that, at all events, the provider had not established the requisite detriment to its position. Id. at 61-62, 104 S.Ct. at 2224-25
 
 
 [18]
 We thus conclude that Monongahela's reliance on Cheshire Hospital v. New Hampshire-Vermont Hospitalization Service, Inc., 689 F.2d 1112, (1st Cir.1982), for the proposition that "[i]n analyzing regulations which are retroactive in effect, ... 'laws that unsettle settled rights can be harsh, and they deserve special scrutiny,' " id. at 1121 (citation omitted), is misplaced. We note, moreover, that in Cheshire Hospital the court ultimately rejected the plaintiff hospital's contention that the Secretary, in subjecting its debt service reserve funds to the interest offset rule, retroactively had applied a new interpretation of the regulations. Id. at 1121-22. Notwithstanding that the plaintiff's fiscal intermediary earlier had notified the hospital that all interest expense would be reimbursable, the court concluded that no "settled industry understanding" existed as to the application of the interest offset rule to income on debt service reserve funds and, therefore, that the Secretary's application of the rule could not have upset the hospital's reasonable expectations
 
 
 [19]
 42 C.F.R. § 405.415(e) provides:
 Although funding of depreciation is not required, it is strongly recommended that providers use this mechanism as a means of conserving funds for replacement of depreciable assets, and coordinate their planning of capital expenditures with areawide planning activities of community and State agencies. As an incentive for funding, investment income on funded depreciation will not be treated as a reduction of allowable interest expense.
 
 
 [20]
 Finally, we note that we find Monongahela's reliance on Northwest Hospital, Inc. v. Hospital Service Corp., 687 F.2d 985 (7th Cir.1982), inapposite. Northwest Hospital involved the Secretary's blanket disallowance of an interest expense incurred as a result of a loan received from party related to the provider. The Northwest Hospital court concluded that this blanket disallowance was "broader than either the language or the purpose of the Medicare statute can be construed to authorize" and that the Secretary's application of the regulation concerning related-party loan transactions was inconsistent with the rationale undergirding that regulation. Id. at 992. As the foregoing discussion demonstrates, we think that the Secretary's determination that the funds that Monongahela transferred to Mon Vale did not qualify for the exception to the interest offset rule accords with both the language and purpose of the relevant statutory and regulatory provisions